Crescent Univ. City Venture, LLC v. AP Atl., Inc., 2019 NCBC 46.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CRESCENT UNIVERSITY CITY
VENTURE, LLC,

        Plaintiff,

v.

AP ATLANTIC, INC. d/b/a
ADOLFSON & PETERSON
CONSTRUCTION,

        Defendant,

v.

MADISON CONSTRUCTION
GROUP, INC.; TRUSSWAY
MANUFACTURING, INC.; T. A.
KAISER HEATING & AIR, INC.;
SEARS CONTRACT, INC.; MACEDO
CONTRACTING CO.; WHALEYS
DRYWALL, LLC; STALLINGS
DRYWALL, LLC; MAYNOR PI, INC.;
MATUTE DRYWALL, INC.;
INTERIOR DISTRIBUTORS, A
DIVISION OF ALLIED BUILDING
PRODUCTS, CORP.; MANUEL
BUILDING CONTRACTORS, LLC;
EAGLES FRAMING COMPANY,
INC.; DIAZ CARPENTRY, INC.;
SOCORRO CASTILLE MONTLE;
and GUERRERO CONSTRUCTION
PRO, INC.

        Third-Party
        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 14745 (Master File)

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

MADISON CONSTRUCTION
GROUP, INC.,

> Third-Party
> Plaintiff,

v.

MANUEL BUILDING
CONTRACTORS, LLC,

> Fourth-Party
> Defendant.

CRESCENT UNIVERSITY CITY
VENTURE, LLC,

> Plaintiff,

v.

ADOLFSON & PETERSON, INC.,

> Defendant.

16 CVS 14844 (Related Case)

CRESCENT UNIVERSITY CITY
VENTURE, LLC,

> Plaintiff,

v.

TRUSSWAY MANUFACTURING,
INC.; and TRUSSWAY
MANUFACTURING, LLC,

> Defendants.

18 CVS 1642 (Related Case)

1. **THIS MATTER** is before the Court upon (i) Defendant AP Atlantic, Inc. d/b/a/ Adolfson & Peterson Construction ("AP Atlantic") and Adolfson & Peterson, Inc.'s ("A&P," and together with AP Atlantic, the "AP Parties") Motion for Summary

Judgment ("AP Parties' Motion"); (ii) Third-Party Defendant Madison Construction Group, Inc.'s ("Madison") Motion for Summary Judgment ("Madison's Motion"); (iii) Third-Party Defendant T.A. Kaiser Heating & Air, Inc.'s ("T.A. Kaiser") Motion for Summary Judgment ("T.A. Kaiser's Motion"); (iv) Third-Party Defendant Trussway Manufacturing, LLC's ("Trussway") Motion for Summary Judgment Against AP Atlantic, Inc., Adolfson & Peterson Inc., Madison Construction Group, Inc., and T.A. Kaiser Heating & Air, Inc. ("Trussway's Motion"); (v) Third-Party Defendant Sears Contract, Inc.'s ("Sears") Motion for Summary Judgment ("Sears' Motion"); and (vi) Third-Party Defendant Interior Distributors, a Division of Allied Building Products, Corp.'s ("Interior Distributors") Motion for Summary Judgment ("Interior Distributors' Motion") (collectively, with each other summary judgment motion, the "Motions for Summary Judgment") in the above-captioned case.

2. For the reasons stated herein, the Court **GRANTS** Interior Distributors' Motion and **GRANTS in part** and **DENIES in part** each of the other Motions for Summary Judgment.

> *Troutman Sanders LLP, by Kiran H. Mehta, Samuel T. Reaves, and Kristen L. Schneider, Bradley Arant Boult Cummings LLP, by Avery A. Simmons and Douglas Patin, and the Law Firm of John D. Bond, III, by John D. Bond, for Plaintiff Crescent University City Venture, LLC.*

> *Robinson Elliot & Smith, by William C. Robinson and Dorothy M. Gooding, Johnston, Allison & Hord, P.A., by Greg C. Ahlum, Robert L. Burchette, and Parker Evans Moore, Hall Booth Smith, P.C., by Robert McCune and Alan R. Belcher, and Ragsdale Liggett PLLC, by William W. Pollock and Edward E. Coleman, III, for Defendant AP Atlantic, Inc. d/b/a Adolfson & Peterson Construction.*

> *Johnston, Allison & Hord, P.A., by Greg C. Ahlum, Robert L. Burchette, and Parker Evans Moore, for Defendant Adolfson & Peterson, Inc.*

*Baucom, Claytor, Benton, Morgan & Wood, P.A., by Brian E. Wolfe, Robert C. Gunst, Jr., and Clay A. Campbell, for Third-Party Defendant Madison Construction Group, Inc.*

*Goodman McGuffey LLP, by W. James Flynn, for Third-Party Defendant T.A. Kaiser Heating & Air, Inc.*

*Smith Moore Leatherwood LLP, by Timothy P. Lendino and Robert R. Marcus, and Pagel, Davis & Hill, P.C., by Martyn B. Hill and Kent J. Pagel, for Third-Party Defendant Trussway Manufacturing, LLC f/k/a Trussway Manufacturing, Inc.*

*Hedrick Gardner Kincheloe & Garofalo LLP, by David L. Levy and Adam R. DeNobriga, for Third-Party Defendant Sears Contract, Inc.*

*Cranfill Sumner & Hartzog LLP, by John W. Ong, for Third-Party Defendant Interior Distributors, a Division of Allied Building Products, Corp.*

Bledsoe, Chief Judge.

## I.

## FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on motions for summary judgment, but "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue[.]" *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).

4. This case arises from the construction of a multi-building apartment complex (the "Project") near the University of North Carolina at Charlotte ("UNC Charlotte") and a dispute over alleged floor truss defects that developed shortly after

the Project's completion. Crescent was the owner of the Project; AP Atlantic was the general contractor.

5.     AP Atlantic is a North Carolina corporation that maintains its principal place of business in Charlotte, North Carolina. (Am. Compl. ¶ 1, ECF No. 6.) Crescent University City Venture, LLC ("Crescent") is a limited liability company organized under the laws of Delaware that also maintains its principal place of business in Charlotte, North Carolina. (Def. Crescent Univ. City Venture, LLC's Am. Answer & Second Am. Countercl. Am. Compl. ¶ 8, ECF No. 212.)

6.     In December 2012, Crescent and AP Atlantic entered into a contract (the "General Contract")[1] by which AP Atlantic agreed to construct an apartment complex on land owned by Crescent located at 9026 University City Boulevard, Charlotte, North Carolina. (*See generally* Crescent Univ. City Venture, LLC's Resp. Opp'n AP Atlantic, Inc. and Adolfson & Peterson Constr., Inc.'s Mot. Summ. J. Ex. A [hereinafter "General Contract"], ECF No. 414.2.) A&P, AP Atlantic's parent company, signed a performance guaranty (the "Performance Guaranty") relating to AP Atlantic's obligations under the General Contract. (Reply Br. AP Atl., Inc. and Adolfson & Peterson, Inc. Further Supp. Mot. Partial Summ. J. Ex. E ¶ 1 [hereinafter "Performance Guaranty"], ECF No. 440.)

---

[1] AP Atlantic and Crescent's full agreement was laid out in a combination of form documents. As used herein, the "General Contract" refers to the "General Conditions of the Contract for Construction," which contains the majority of provisions relevant to this decision.

7.     Acting as the general contractor, AP Atlantic entered into agreements with several subcontractors to facilitate the construction of the Project. The Court mentions here those relevant to this decision.

8.     AP Atlantic enlisted Madison to provide and install wood framing, including floor trusses, for the Project and to provide the labor necessary to complete such work. (*See generally* Crescent Univ. City Venture, LLC's Resp. Opp'n AP Atlantic, Inc. and Adolfson & Peterson Constr., Inc.'s Mot. Summ. J. Ex. B [hereinafter "Madison Subcontract"], ECF No. 414.3.) Madison, in turn, contracted with Trussway, which agreed to manufacture and deliver the trusses Madison needed. (Madison Constr. Grp., Inc.'s Br. Supp. Mot. Summ. J. Ex. G, at 1 [hereinafter "Purchase Order"], ECF No. 313.) Crescent's experts now contend that the Project's truss defects were attributable, in part, to Madison's handling of the trusses and flaws in Trussway's design and manufacturing process. (*See* Madison Constr. Grp., Inc.'s Resp. Br. Opp'n Trussway Mfg., Inc.'s Mot. Summ. J. Cross-cls. Ex. G, at 14 [hereinafter "SGH Expert Report"], ECF No. 407.7.)

9.     AP Atlantic hired Sears as its drywall subcontractor. (*See generally* Sears Contract, Inc.'s Mot. Summ. J. Ex. B [hereinafter "Sears Subcontract"], ECF No. 301.2.) Sears' responsibilities included delivering drywall to the Project site, stacking the drywall when it arrived, and installing the drywall. (Sears Subcontract Ex. D, at 1–3.) According to Sears, it ordered its drywall from Interior Distributors, who agreed to deliver and stack the drywall at the Project. (Interior Distribs., Div. Allied Bldg. Prods., Corp.'s Mem. Supp. Mot. Summ. J. Ex. 2, at 52:20–23, ECF No. 327.2.)

Crescent's experts believe the manner in which Sears, or Interior Distributors under Sears' direction, stacked the drywall on the Project's upper floors was a possible contributor to the Project's truss defects. (SGH Expert Report 14.)

10. Finally, AP Atlantic recruited T.A. Kaiser Heating & Air, Inc. ("T.A. Kaiser") to furnish all materials, labor, supervision, tools, equipment, and supplies necessary for the installation of the Project's HVAC systems. (*See generally* Br. AP Atl., Inc. and Adolfson & Peterson, Inc. Opp'n T.A. Kaiser Heating & Air, Inc.'s Mot. Summ. J. Ex. A [hereinafter "T.A. Kaiser Subcontract"], ECF No. 373.) T.A. Kaiser is alleged to have damaged the Project's trusses while performing its work. (SGH Expert Report 15.)

11. The Project's buildings were completed between August 20, 2014 and January 22, 2015. (Br. AP Atl., Inc. and Adolfson & Peterson, Inc. Supp. Mot. Summ. J. 7 [hereinafter "AP Atl. Br. Supp. Summ. J."], ECF No. 323.) By January 2015, residents had moved in. (AP Atl. Br. Supp. Summ. J. 7.) The alleged truss defects at the heart of this litigation were discovered soon thereafter.

12. Located directly next to UNC Charlotte, the Project was intended to serve as residential student housing. (AP Atl. Br. Supp. Summ. J. 3.) On January 30, 2015, a large group of individuals, presumably students, congregated within Unit C-402 for what has been described as a "dance party." (AP Atl. Br. Supp. Summ. J. 3.) Sometime shortly thereafter, Crescent and its property manager were alerted that the ceiling in the unit directly below Unit C-402 was sagging and cracking. (Crescent Univ. City Venture, LLC's Resp. Opp'n AP Atlantic, Inc. and Adolfson & Peterson

Constr., Inc.'s Mot. Summ. J. 3–4 [hereinafter "Crescent Opp'n Br."], ECF No. 414.) As a result, Crescent's insurance carrier notified AP Atlantic, the first-tier subcontractors, and others, including Trussway, of the damage to the ceiling, warned litigation might result from the damage, and invited the parties to a February 17, 2015 inspection of the affected apartments. (AP Atl. Br. Supp. Summ. J. Ex. G., at 1–2, ECF No. 323.7.)

13.    At the February 17, 2015 inspection, an engineering consultant working for Crescent's insurance carrier examined the damaged apartment ceiling below Unit C-402. (Crescent Opp'n Br. 4.)  Representatives of AP Atlantic and Trussway were present at this inspection. (AP Atl. Br. Supp. Summ. J. 7.)  The inspection revealed a defect in the floor trusses found above the sagging ceiling.

14.    Wooden floor trusses like those used in the Project are composed of a lattice of wood members fastened together at their joints by metal connector plates, or "MCPs." (Trussway Mfg., LLC's Br. Supp. Mot. Summ. J. Against AP Atl., Inc., Adolfson & Peterson, Inc., Madison Constr. Grp., Inc., and T.A. Kaiser Heating & Air, Inc. 5 [hereinafter, "Trussway Br."], ECF No. 299.)  The truss manufacturer aligns these MCPs, which have sharp "teeth" on one side, over the spots where the wood members meet, teeth pointed down. (Trussway Br. 5–6.)  The MCPs are then pressed into the converging wood members so that the members are bound together. (Trussway Br. 5–6.)  Floor decking is laid on top of the installed trusses. (Trussway Br. 5.)  The February 17, 2015 inspection revealed that the MCPs holding together

the floor trusses beneath Unit C-402 had begun to separate from their wooden members. (AP Atl. Br. Supp. Summ. J. Ex. D, at 108:14–21, ECF No. 323.4.)

15. Crescent initially believed that the truss plate separation observed under Unit C-402 was a result of the crowded party held in that apartment and that the truss failures were limited to that location. (AP Atl. Br. Supp. Summ. J. Ex. E, at 125:3–13 [hereinafter "Crescent Dep. Vol. I"], ECF No. 323.5.) AP Atlantic agreed with this assessment. (AP Atl. Br. Supp. Summ. J. 8.)

16. Nevertheless, in late March or early April 2015, Crescent hired an independent engineering firm, Simpson Gumpertz & Heger, Inc. ("SGH"), to conduct an investigation of the floor trusses under Unit C-402. This inspection, which occurred on April 9, 2015, did not conclusively determine whether the truss defects observed were an isolated incident. (Crescent Dep. Vol. I, at 137:1–15.)

17. Soon thereafter, SGH inspected the floor trusses above the bedroom of the apartment below Unit C-402 and the floor trusses above an unoccupied model apartment. (Crescent Dep. Vol. 1, at 141:2–23.) These inspections revealed trusses with similar MCP separation defects. (Crescent Dep. Vol. 1, at 141:2–23.) SGH obtained permission to inspect a larger number of apartments in order to assess whether the truss defects were systemic. (Crescent Opp'n Br. Ex. E. ¶ 9 [hereinafter "Ford Aff."], ECF No. 414.6.)

18. On May 1, 2015, Crescent learned that the floor in another Project apartment, Unit E-203, was sagging. (Crescent Opp'n Br. Ex. F., at 101:16–102:10 [hereinafter "Crescent Dep. Vol. II"], ECF No. 414.7.)

19. On May 4, 2015, Crescent e-mailed AP Atlantic a letter indicating that Crescent was asserting a warranty claim for truss defects. (Crescent Opp'n Br. Ex. G, ECF No. 414.8.) In the letter, Crescent noted that its analysis was ongoing, that it did not yet know the cause of the truss failures discovered thus far, and that it was not aware of how pervasive the problem might be throughout the Project. (Crescent Opp'n Br. Ex. G.) Crescent also noted, however, "that there [was] sufficient information to support a belief that the failures may [have been] the result of defective truss design, defective manufacture of the trusses, defective truss installation, and/or structural damage by the HVAC subcontractor." (Crescent Opp'n Br. Ex. G.) Crescent stated that it believed the "described truss failures and resulting property damage [were AP Atlantic's] responsibility to remedy under the warranty provisions of" the General Contract. (Crescent Opp'n Br. Ex. G.)

20. On May 11, 2015, Crescent's and AP Atlantic's senior management held a telephone call on which Crescent asked AP Atlantic to investigate the truss defects and provide Crescent with a repair plan. (Ford Aff. ¶ 12.) Crescent also stated that it would need any repairs to be conducted during the summer and completed before student residents moved in again in the fall. (Ford Aff. ¶ 12.)

21. On May 13, 2015, an AP Atlantic representative accompanied a structural engineering consultant in an inspection of several apartments at the Project, particularly apartments SGH was then inspecting or in which SGH had already discovered truss defects. (Ford Aff. ¶ 13.)

22.     On May 15, 2015, SGH informed Crescent that it believed the already-discovered truss defects were a sample of a systemic, Project-wide, truss-defect problem. (Ford Aff. ¶ 14.) That same day, Crescent reached out to Summit Contracting Group, Inc. ("Summit") and asked if Summit would be able to perform truss work on the Project if AP Atlantic did not. (Ford Aff. ¶ 15.)

23.     During the remainder of May 2015, Crescent and AP Atlantic had several more discussions concerning possible repairs to the Project. Crescent executive Jared Ford and AP Atlantic's Corbett Nichter discussed repair schedules, Crescent's desire to complete repair work before the fall school semester, and Summit's availability as a backup contractor. (Ford Aff. ¶ 16.)

24.     On May 27, 2015, SGH released an initial inspection report. The report indicated that 28% of the MCPs in the floor trusses, and a small percentage of MCPs in roof trusses, showed gaps between MCPs and wood members in excess of the allowed maximum. (AP Atl. Br. Supp. Summ. J. Ex. K, at 16, ECF No. 323.11.) This included trusses in apartments that had no apparent signs of truss failure. (AP Atl. Br. Supp. Summ. J. Ex. K, at 16.) SGH reported that it could not conclusively confirm "whether the excessive gaps observed . . . [were] the results of faulty fabrication alone and failure of the fabricator to properly press the metal plate connectors" or whether the issues were the result of a defective design "that allowed tooth withdrawal during the relatively short service life of the buildings." (AP. Atl. Br. Ex. K, at 16.) SGH planned to conduct further inspections but concluded that "a substantial repair of

connections of the wood trusses in Building A/B through F" would be required. (AP Atl. Br. Supp. Summ. J. Ex. K, at 16.)

25. The next day, Crescent's and AP Atlantic's management again held a call. Crescent informed AP Atlantic that it believed "the extent of truss failure [was] a material breach and default under" the General Contract but that Crescent did not want to terminate the contract if possible. (Crescent Dep. Vol. II, at 195:12–16.) According to Crescent, AP Atlantic was, at this point, considering hiring Summit to do the repair work. (Crescent Dep. Vol. II, at 196:1–3.) On the call, however, AP Atlantic's CEO, Rick Whitney ("Whitney"), informed Crescent that AP Atlantic could not perform the repairs Crescent wanted within the summer timeframe Crescent was requesting. (Crescent Dep. Vol. II, at 196:5–9; Crescent Opp'n Br. Ex. J, at 87:5–23, ECF No. 414.11.)

26. On Friday, May 29, 2015, Crescent's Senior Vice President, Benjamin Collins ("Collins"), sent AP Atlantic a letter via e-mail informing AP Atlantic that Crescent needed repair work to begin no later than June 2, 2015 and to be finished by no later than August 15, 2015. (Crescent Opp'n Br. Ex. K, ECF No. 414.12.) Collins invited AP Atlantic to propose a plan for completing the repair work on this timetable but indicated that AP Atlantic would be required to provide the plan by no later than the following Monday, June 1, 2015. (Crescent Opp'n Br. Ex. K.) Collins also informed AP Atlantic that Crescent was in the process of procuring repair work from Summit, who had committed to meeting the August 15 deadline. (Crescent

Opp'n Br. Ex. K.) Collins stated that Crescent intended to hold AP Atlantic fully responsible for the cost of any repairs. (Crescent Opp'n Br. Ex. K.)

27. The following Monday, June 1, 2015, AP Atlantic sent Crescent a letter objecting to the repair-plan deadline Crescent had imposed. (Crescent Opp'n Br. Ex. L, ECF No. 414.13.) AP Atlantic stated that it had five days after receipt of a written notice under the General Contract's terms to commence the correction of defective work and that AP Atlantic had "already commenced investigating and correcting defective work associated with the floor truss issues," citing AP Atlantic's presence at the Project for the May 13, 2015 inspection and an upcoming inspection scheduled for June 15, 2015. (Crescent Opp'n Br. Ex. L.) On June 2, 2015, AP Atlantic followed up with a second letter, indicating that it had notified Madison and Trussway of the need for further inspections, that all parties were "diligently prosecuting plans for repairs," and that AP Atlantic's "third-party engineer, subcontractor and supplier [were] developing a comprehensive proposal for remediating any construction or manufacturing defects." (Crescent Opp'n Br. Ex. M, at 2, ECF No. 414.14.) AP Atlantic further stated that it remained open to serving as a "construction manager" in relation to any remedial work, with Summit serving as its subcontractor, but also reaffirmed that it could not "commit to complete the work in [the timeframe] demanded until the scope of the remediation work [had] been determined and defined." (Crescent Opp'n Br. Ex. M, at 2.)

28.    On June 3, 2015, Crescent issued a notice to Summit that it should proceed with the Project-wide truss work.  (Crescent Opp'n Br. Ex. D ¶ 17 [hereinafter, "Collins Aff."], ECF No. 414.5.)

29.    On June 4, 2015, Crescent sent AP Atlantic another letter, this time informing AP Atlantic that Summit was proceeding with the truss work and stating "if at any time [AP Atlantic] feels that it can perform all or any part of the required repair work in the summer term time required, [Crescent] will gladly consider [AP Atlantic's] proposal for such[.]" (Crescent Opp'n Br. Ex. N, ECF No. 414.15.)  Crescent further stated that if AP Atlantic submitted a proposal that was "realistic, reasonable and acceptable," Crescent was "prepared to terminate all or any portion of Summit's scope of repair work to accommodate [AP Atlantic's] involvement in the performance of the repair work."  (Crescent Opp'n Br. Ex. N.)  Any proposal would be carefully scrutinized, according to Crescent, to "assure that" AP Atlantic would be able to "perform the repairs under the very tight schedule demanded by the circumstances of [the] structural problem." (Crescent Opp'n Br. Ex. N.)

30.    On June 8, 2015, AP Atlantic provided Crescent with its engineering consultant's report.  This report disagreed with a number of points made by SGH's earlier report on the size and scope of truss defects at the Project and urged that Trussway and Madison be involved so that an "informed decision about the true structural capabilities and required repairs" could be made.  (AP Atl. Br. Supp. Summ. J. Ex. N, at 6, ECF No. 323.14.)  At this point, AP Atlantic desired more information, believed it had not had a chance to thoroughly investigate the alleged

defects, and thought Crescent and SGH's current repair plan "looked like . . . a design enhancement" compared to the original specifications for the Project. (AP Atl. Br. Supp. Summ. J. 15; AP Atl. Br. Supp. Summ. J. Ex. B, at 318:15–17 [hereinafter "AP Atl. Dep."], ECF No. 323.2.)

31.  Crescent and Summit executed an official contract on June 17, 2015. (Collins Aff. ¶ 17.)

32.  On at least one occasion, AP Atlantic and Trussway sent representatives out to the Project to perform further investigations while Summit was working. (AP Atl. Dep. 349:8–20.) According to AP Atlantic, Crescent informed AP Atlantic's and Trussway's representatives that Summit would be handling the repair work and that there was no need for either to be there. (AP Atl. Br. Supp. Summ. J. 16.)

33.  Summit's work was completed and county inspector approval was obtained by August 19, 2015. (Ford Aff. ¶ 28.)

## II.

## PROCEDURAL HISTORY

34.  AP Atlantic initiated litigation against Crescent on August 5, 2015 to recover allegedly outstanding payments due from Crescent for the original construction of the Project. (Compl. ¶ 23, ECF No. 1.) The Court refers to this original litigation, which bears the Mecklenburg County civil case number 15 CVS 14745, as the "Lead Action."

35.  Soon after the Lead Action was filed, AP Atlantic amended its Complaint to add alternative breach of contract claims against Madison and T.A. Kaiser and an

alternative negligence claim against Trussway. (Am. Compl. ¶¶ 115, 146, 193.) AP Atlantic alleged that to the extent Crescent was entitled to withhold payment from AP Atlantic due to defects in the Project's floor trusses, Madison and T.A. Kaiser's breaches of contract and Trussway's negligence in manufacturing or designing the trusses factually and proximately damaged AP Atlantic and therefore AP Atlantic would be entitled to recover from each. (Am. Compl. ¶¶ 144, 176, 196.)

36.   On January 29, 2016, Crescent asserted a counterclaim for breach of contract against AP Atlantic on multiple grounds, including the initial late completion of the Project and the allegedly defective floor trusses. (Def. Crescent Univ. City Venture, LLC's Answer & Countercl. Am. Compl. 38, 43–57, ECF No. 19.)

37.   In response to Crescent's counterclaim, AP Atlantic asserted a third-party breach of contract claim against Sears for construction delays. (Pl.'s Am. Reply and Affirmative Defenses Crescent Univ. City Venture, LLC's Countercl. and Third-Party Compl. 5, ECF No. 37.) AP Atlantic subsequently amended this claim to include allegations related to floor truss failure. (AP Atl., Inc.'s Am. Third-Party Compl. Against Sears Contract, Inc. ¶ 25, ECF No. 56.)

38.   On April 14, 2016, the Chief Justice of the Supreme Court of North Carolina designated the Lead Action as a complex business case in accordance with Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts and assigned the case to the undersigned.

39.   On August 19, 2016, Crescent began a separate Mecklenburg County action (numbered 16 CVS 14844) (the "Crescent Action") against AP Atlantic's parent entity,

A&P. The Crescent Action was designated as a mandatory complex business case under N.C.G.S. § 7A-45.4(b) and assigned to the undersigned as well. The Court then consolidated the Crescent Action with the Lead Action on October 10, 2016. (Order Mot. Consolidate ¶ 7, ECF No. 98.) Crescent's complaint against A&P was subsequently amended to assert a single claim against A&P for enforcement of the Performance Guaranty. (Am. Compl. ¶¶ 56–58 [hereinafter "Crescent's Am. Compl."], ECF No. 153.)

40. As part of the Crescent Action, A&P filed a counterclaim against Crescent for breach of contract. (Adolfson & Peterson Constr., Inc.'s Mot. Dismiss, Answer, Affirmative Defenses, Countercl. and Third-Party Compl. 27 [hereinafter "A&P Third-Party Compl."], ECF No. 125.) A&P also asserted third-party claims for breach of contract and negligence against Madison, Sears, and T.A. Kaiser, and a claim for negligence against Trussway. (A&P Third-Party Compl. 28, 34, 37, 43, 46, 52, 56.)

41. Over the course of the consolidated proceedings, AP Atlantic's first- and lower-tier contractors have also asserted crossclaims against each other, including the following.

42. Madison maintains crossclaims against (i) Trussway for breach of contract, breach of warranty, negligence, indemnity, and contribution and (ii) T.A. Kaiser for negligence and contribution. (Def. Madison Constr. Grp., Inc.'s Answer AP Atl., Inc.'s Am. Compl., Cross-cl. Against Trussway Mfg., Inc., Cross-cl. Against T.A. Kaiser Heating & Air, Inc., Third-Party Compl. Against Manuel Bldg. Contractors, LLC 11–17 [hereinafter "Madison Answer and Cross-cls."], ECF No. 39.) Madison has also

asserted a third-party claim against Sears for negligence and contribution to the extent Madison is liable for A&P's claims. (Madison Constr. Grp., Inc.'s Answer Adolfson & Peterson, Inc.'s Third-Party Compl. and Cross-cls. Against Sears Contract, Inc. 12–13 [hereinafter "Madison Cross-Cls. Against Sears"], ECF No. 148.)

43. Trussway asserts crossclaims against (i) Madison for breach of contract, indemnity, and contribution and (ii) T.A. Kaiser for negligence and contribution. (Trussway Mfg., Inc.'s Answer Madison Constr. Grp., Inc.'s Cross-cl. and Cross-cl. Against Madison Constr. Grp., Inc. and T.A. Kaiser Heating & Air, Inc. 7–11 [hereinafter "Trussway Cross-cls."], ECF No. 50.) Trussway also asserts third-party claims against Sears for negligence and contribution. (Trussway Mfg., Inc.'s Third-Party Claim Against Sears Contract, Inc. ¶¶ 8–19, ECF No. 104.)

44. T.A. Kaiser brings crossclaims against Madison and Trussway for negligence and contribution. (Am. Answer Def. T.A. Kaiser Heating & Air, Inc. Madison Constr. Grp., Inc's Cross-cl. and Am. Cross-cl. Against Madison Constr. Grp. 5–6 [hereinafter "T.A. Kaiser Cross-cls. Against Madison"], ECF No. 59; Answer Def. T.A. Kaiser Heating & Air, Inc. Trussway Mfg.'s Cross-cl. and Cross-cl. Against Trussway Mfg., Inc. 4–6 [hereinafter "T.A. Kaiser Cross-cls. Against Trussway"], ECF No. 60.)

45. On June 6, 2017, the AP Parties and Crescent entered into a settlement agreement resolving AP Atlantic's and A&P's claims against Crescent (the "Delay Settlement"). (Consent Order Cross Mots. Partial Summ. J. AP Atl., Inc. Adolfson & Peterson, Inc., and Crescent Univ. City Venture, LLC 4–5 [hereinafter "Consent

Settlement Order"], ECF No. 272.) The Delay Settlement also resolved Crescent's claims to the extent those claims arose out of the late completion of the Project, liquidated damages, or other delay-related claims, including any allegations that delay in construction caused damage to the Project's trusses. (Consent Settlement Order 4.) Crescent expressly reserved the right to all other claims and causes of action against AP Atlantic relating to the Project's trusses and all claims and causes of action against A&P relating to the Performance Guaranty. (Consent Settlement Order 3.)

46. On July 20, 2017, AP Atlantic filed an amended third-party complaint (the "Amended Third-Party Complaint") that incorporated by reference and reasserted its claims against Madison, Sears, Trussway, and T.A. Kaiser previously asserted in its other pleadings as third-party claims to the extent AP Atlantic was found liable to Crescent for alleged truss defects. (AP Atl., Inc.'s Mot. Strike, Mots. Dismiss, Reply Crescent Univ. City Venture, LLC's Second Am. Countercl., and Third-Party Compl. 12 [hereinafter "Am. Third-Party Compl."] ECF No. 219.) AP Atlantic also asserted new third-party claims for negligence, contribution, and breach of express and implied warranties against a host of lower-tier subcontractors allegedly hired by Sears or Madison to work on the Project, including Interior Distributors. (Am. Third-Party Compl. 12–17.)

47. As a result of the Delay Settlement, on November 30, 2017, Crescent, with the consent of the AP Parties, moved the Court to realign the parties to the case with Crescent as the Plaintiff, AP Atlantic and A&P as Defendants, and the remaining

subcontractors as third-party or fourth-party defendants. In support of this motion, Crescent and the AP Parties acknowledged that the AP Parties had no remaining affirmative claims against Crescent, that Crescent had "essentially assumed the role of the plaintiff," and that the AP Parties' remaining claims against the subcontractors functioned solely as "derivative third-party claims stemming from Crescent's truss allegations." (Consent Mot. Realign Parties 4, ECF No. 280.) All parties appearing in the Lead and Crescent Actions consented to this requested realignment by e-mail to the Court. Thus, on December 11, 2017, the Court granted Crescent's consent motion and realigned the parties in accordance with Crescent's request. (Order Consent Mot. Realign Parties 5, ECF No. 284.)

48. On February 12, 2018, the AP Parties, Madison, T.A. Kaiser, Trussway, Sears, and Interior Distributors filed their Motions for Summary Judgment. The Court held a hearing on the Motions for Summary Judgment on May 30, 2018, at which all parties appearing in the Lead and Crescent Actions were represented by counsel.

49. The Motions for Summary Judgment are ripe for resolution.[2]

---

[2] The same day the parties filed their Motions for Summary Judgment in the Lead and Crescent Actions, Crescent commenced a new Mecklenburg County action (numbered 18 CVS 1642) against Trussway (the "Trussway Action"), asserting a single negligence claim against the truss manufacturer. The new lawsuit was designated as a mandatory complex business case under N.C.G.S. § 7A-45.4(a) and assigned to the undersigned. The Court consolidated the Trussway Action with the Lead and Crescent Actions on July 16, 2018. *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 2018 NCBC LEXIS 74, at *13–16 (N.C. Super. Ct. July 16, 2018). In its subsequent opinion dealing with supplemental discovery concerning the Trussway Action, the Court made clear that "[d]iscovery in the Lead Action and Crescent Action [would] remain closed" and that further discovery allowed on Crescent's negligence claim in the Trussway Action would not be considered "part of the record in the Lead Action or the Crescent Action for purposes of the pending summary judgment motions in those actions." *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2018 NCBC LEXIS 92, at *10

III.

LEGAL STANDARD

50.  Under Rule 56 of the North Carolina Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to . . . judgment as a matter of law." *Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 353 (2009) (quoting N.C. R. Civ. P. 56(c)).  A material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." *Abner Corp. v. City Roofing & Sheetmetal Co.*, 73 N.C. App. 470, 472, 326 S.E.2d 632, 633 (1985).  "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citations and quotation marks omitted).

51.  On a motion for summary judgment, the moving party bears the burden of showing that no genuine issues of material fact remain to be resolved.  *Camalier v. Jeffries*, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995).  "Evidence presented by the parties is viewed in the light most favorable to the non-movant."  *Summey v. Barker*,

(N.C. Super. Ct. Aug. 29, 2018).  Accordingly, the Court's rulings herein depend solely on the evidence of record in the Lead and Crescent Actions at the time of the May 30, 2018 hearing on the Motions for Summary Judgment and do not concern the merits of any claim in the Trussway Action.

357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003). The trial court should grant summary judgment against an adverse party's claim only if the movant can prove "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense" or can show "through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. If the moving party meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that [it] can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). The responding party may not "rest upon the . . . allegations or denials" within its pleading, but must put forward specific facts showing there is a genuine issue for trial. N.C. R. Civ. P. 56(e).

IV.

ANALYSIS

52. Because the AP Parties' Motion addresses the underlying claims from which the various other claims in this case derive, the Court begins its analysis by resolving that motion. The Court then addresses two matters raised by multiple parties' motions: (i) the various negligence and contribution claims asserted against and among the first- and lower-tier subcontractors, and (ii) AP Atlantic's request to hold certain parties jointly and severally liable. Finally, the Court examines the individual issues raised by the remaining motions.

A.   The AP Parties' Motion

53.   AP Atlantic moves the Court for summary judgment on Crescent's counterclaim for breach of contract, arguing that Crescent may not recover damages under the General Contract when it wrongfully denied AP Atlantic the opportunity to cure the alleged defects.  In the alternative, the AP Parties request that the Court enter summary judgment in their favor on the consequential damages sought by Crescent, arguing that Crescent has expressly waived its right to such damages.  The Court addresses each set of arguments in turn.

1.   Crescent's Denial of an Opportunity to Cure

54.   AP Atlantic primarily argues at summary judgment that Crescent should be precluded from seeking damages for an alleged breach of the General Contract because Crescent itself breached the terms of the parties' agreement by failing to give AP Atlantic an opportunity to cure the alleged truss defects.  AP Atlantic characterizes Crescent's May 29, 2015 letter demanding a repair plan by June 1, 2015 as "blind-siding" AP Atlantic and contends that this demand, and Crescent's subsequent conduct of hiring Summit and refusing to allow AP Atlantic to further investigate alleged defects, did not constitute a reasonable opportunity to cure.  (AP Atl. Br. Supp. Summ. J. 22.)  AP Atlantic suggests that Crescent proceeded in this manner because the truss defects were not a true construction concern but a public-relations problem Crescent was eager to resolve and intimates that Crescent was also attempting to obtain a design enhancement with the plans drawn up by SGH.

55. Crescent responds by arguing that AP Atlantic cannot shield itself with the General Contract because AP Atlantic was, in fact, the first party to materially breach the agreement's terms by anticipatory repudiation. In particular, Crescent cites the May 28, 2015 statements by Whitney indicating that AP Atlantic could not or would not do the work Crescent required in the timeframe demanded as evidence that AP Atlantic unequivocally indicated it would not perform its contractual obligation to cure. Because AP Atlantic repudiated the General Contract, Crescent asserts, AP Atlantic has no grounds on which to argue it was wrongfully deprived of its opportunity to cure. Crescent also argues that numerous questions of fact, such as the reasonableness of the amount of time Crescent offered AP Atlantic to cure the truss defects, render summary judgment inappropriate on this record.

56. "As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." *McClure Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). A "[b]reach of contract occurs when a party fails to perform a contractual duty which has become absolute. . . . [W]hen performance of a duty under contract is presently due any nonperformance constitutes a breach." *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987) (citation omitted). A breach is considered material if it "substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 220, 768 S.E.2d 582, 593 (2015) (quoting *Long v.*

*Long*, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003)). The materiality of a breach of contract is "ordinarily a question for a jury." *Id.* at 221, 768 S.E.2d at 593 (quoting *Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 195 N.C. App. 296, 302, 672 S.E.2d 691, 695 (2009)).

57. The primary issue presented to the Court on the AP Parties' Motion concerns the parties' compliance with the General Contract's terms providing AP Atlantic an opportunity to cure. Because the Court concludes that the AP Parties have failed to show that there is no genuine issue of material fact as to whether Crescent breached these terms, the Court need not reach Crescent's arguments in opposition asserting anticipatory repudiation.

58. North Carolina law generally enforces contract clauses providing a party with an opportunity to cure. *Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, No. 1:13CV651, 2017 U.S. Dist. LEXIS 56215, at *12 (M.D.N.C. Apr. 11, 2017); *see LCA Dev., LLC v. WMS Mgmt. Grp., LLC*, No. COA15-1110, 2016 N.C. App. LEXIS 633, at *6–7 (N.C. Ct. App. June 21, 2016); *Dishner Developers, Inc. v. Brown*, 145 N.C. App. 375, 378, 549 S.E.2d 904, 906, *aff'd*, 354 N.C. 569, 557 S.E.2d 528 (2001). As our Court of Appeals explained in its unpublished decision in *LCA Development*, when an obligor fails to allow an obligee a bargained-for opportunity to cure, he or she deprives the obligee of a benefit promised under their contract. *LCA Dev., LLC*, 2016 N.C. App. LEXIS 633, at *6. Such a deprivation may amount to a material breach of contract and may excuse further performance by the non-breaching party. *See id.* at *6–7; *see also Dishner Developers, Inc.*, 145 N.C. App. at

378, 549 S.E.2d at 906 (holding defendant breached contract and relieved plaintiff of further performance obligations when defendant failed to provide written notice of a defect and failed to give plaintiff time to cure the defect).

59. The Court begins its inquiry into whether a breach of the General Contract occurred by examining the language of the contract itself. "In a contract dispute between two parties, the trial court may interpret a plain and unambiguous contract as a matter of law if there are no genuine issues of material fact." *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 605, 755 S.E.2d 56, 59 (2014). In doing so, the trial court seeks to determine the "intent of the parties when the contract was issued" by examining "the language in the contract." *N.C. State Bar v. Merrell*, 243 N.C. App. 356, 370, 777 S.E.2d 103, 114 (2015) (quoting *Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 455, 750 S.E.2d 205, 209 (2013)). The language in the contract is given its "natural and ordinary meaning," *Southpark Mall Ltd. P'ship v. CLT Food Mgmt.*, 142 N.C. App. 675, 678, 544 S.E.2d 14, 16 (2001) (quoting *Charlotte Hous. Auth. v. Flemming*, 123 N.C. App. 511, 514, 473 S.E.2d 373, 375 (1996)), because it is strongly presumed "that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety," *Branch Banking & Tr. Co. v. Chicago Title Ins. Co.*, 214 N.C. App. 459, 464, 714 S.E.2d 514, 518 (2011) (quoting *Hice v. Hi-Mil, Inc.*, 301 N.C. 647, 651, 273 S.E.2d 268, 270 (1981)). In determining the parties' intent, the court must construe the contract "in a manner that gives effect to all of its provisions," if such can be reasonably done. *Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992).

60. The General Contract's Section 3.5 warranted that AP Atlantic's work would "conform to the requirements of the Contract Documents and [would] be free from defects, except those inherent in the quality of the Work the Contract Documents require[d] or permit[ed]" and further provided that "Work, materials, or equipment not conforming to these requirements [could] be considered defective." (General Contract § 3.5.) The term "Work" was defined as "the construction and services required by the Contract Documents, whether completed or partially completed, and include[d] all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations." (General Contract § 1.1.3.) The Contract Documents were "enumerated in the Agreement between the Owner and Contractor . . . and consist[ed] of the Agreement, Conditions of the Contract [i.e., the General Contract] . . . , Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement[,] and Modifications issued after execution of the Contract." (General Contract § 1.1.1.)

61. Viewing the facts in the light most favorable to Crescent as the nonmoving party, the Court concludes that the record contains evidence from which a reasonable factfinder could infer that a portion of the Project's trusses were defective and thus did not conform to the General Contract's warranty contained in Section 3.5. The Court therefore turns to examine the parties' obligations and rights with respect to defective Work.

62. The General Contract required AP Atlantic to "promptly correct Work . . . failing to conform to the requirements of the Contract Documents, whether

discovered before or after Substantial Completion and whether or not fabricated, installed or completed." (General Contract. §12.2.1.) "Substantial Completion" referred to the point at which the Project was sufficiently complete to be used for its "intended use as student housing." (General Contract § 9.8.1.) The General Contract further provided as follows:

> [I]f, within one year after the date of . . . Substantial Completion of the Work . . . any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so[.]

(General Contract § 12.2.2.1.) This provision required Crescent to "give such notice promptly after discovery of the condition," and stated "[i]f the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner . . . , the Owner may correct it in accordance with Section 2.4." (General Contract § 12.2.2.1.)

63. Section 2.4, titled "Owner's Right to Carry Out the Work," in turn contained two sentences. The first provided:

> If the Contractor defaults or fails to carry out the Work in accordance with the Contract Documents and fails within a five-day period after receipt of written notice from the Owner to commence and continue correction of such default or failure with diligence and promptness, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies.

(General Contract § 2.4.) The second sentence read:

> In such case an appropriate Change Order shall be issued (not requiring Contractor's agreement or signature) deducting from payments then or thereafter due to the Contractor the reasonable cost of correcting such deficiencies . . . . If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

(General Contract § 2.4.)

64. Examining these provisions, the Court forms several conclusions.

65. First, regardless of whether the Project was substantially completed, AP Atlantic was obligated to "promptly correct Work" which failed "to conform to the requirements of the Contract Documents[.]" (General Contract § 12.2.1.)

66. Second, if AP Atlantic's Work failed to comply with the Contract Documents, and AP Atlantic failed to "commence and continue correction" of the defective Work "with diligence and promptness" within five days of receipt of written notice from Crescent, Crescent had the right to correct the defects on its own. (General Contract § 2.4.) "In such [a] case," i.e., when the owner's right to self-correct was triggered, Section 2.4 provided procedures for adjusting costs based upon Crescent's self-correction. (*See* General Contract § 2.4.)

67. Third, if, after Substantial Completion, Crescent discovered defects in the Work failing to comply with the Contract Documents, Crescent was required to send written notice to AP Atlantic, and AP Atlantic was required to correct the nonconforming Work within a reasonable time after receipt of that notice. (General Contract § 12.2.2.1.) If AP Atlantic failed to correct the nonconforming Work within a reasonable time period, Crescent was permitted to correct the Work in accordance with the provisions for self-correction outlined in Section 2.4. (General Contract § 12.2.2.1.)

68. Thus, read plainly, Sections 12.2.2.1 and 2.4 provide two circumstances that would trigger Crescent's right to self-correct Work that did not conform to the

Contract Documents: (i) if, within five days of receipt of written notice from Crescent, AP Atlantic failed to "commence and continue correction" of the offending defect "with diligence and promptness," (*see* General Contract § 2.4); and (ii) if, after Substantial Completion, defects were discovered and noticed and AP Atlantic failed to correct those defects within a reasonable time after receipt of Crescent's notice, (*see* General Contract § 12.2.2.1).

69. AP Atlantic and Crescent do not dispute that the Project was completed or substantially completed by January 2015. Thus, once Crescent sent AP Atlantic written notice concerning its alleged truss defects, Crescent gained the right to self-correct if AP Atlantic (i) failed to, within five days of receipt of Crescent's notice, "commence and continue correction . . . with diligence and promptness" or (ii) failed to correct the noticed defects within a reasonable time. (*See* General Contract §§ 2.4, 12.2.2.1.) Once this right to self-correct was triggered, Crescent could correct in accordance with the further provisions in Section 2.4. (*See* General Contract § 2.4.)

70. AP Atlantic argues at summary judgment that Crescent breached the General Contract by not providing AP Atlantic with a reasonable time to cure before invoking its right to self-correct. AP Atlantic has not addressed its own obligation to commence and continue correction of any defective Work "with diligence and promptness" within five days following a written notice from Crescent or whether Crescent properly invoked its right to self-correct under this provision. At summary judgment, the Court concludes genuine issues of fact remain as to whether Crescent's actions breached either provision.

71. Viewing the record in the light most favorable to Crescent, the Court concludes that reasonable minds could differ as to whether AP Atlantic proceeded with diligence and promptness to correct the alleged truss defects or whether Crescent afforded AP Atlantic a reasonable opportunity to do so. On the one hand, AP Atlantic argues that Crescent's May 4, 2015 letter did not put AP Atlantic on notice of the full scope of alleged truss defects; that Crescent's June 1 deadline for a repair plan set by Crescent's May 29, 2015 letter was unreasonable; that Crescent's mid-August deadline for completion of any remedial work was also unreasonable; and that AP Atlantic was proceeding promptly, diligently, and in line with common industry practice. On the other hand, the record contains evidence tending to show that Crescent's May 4, 2015 letter notified AP Atlantic that Crescent believed there was "sufficient information to support a belief that the [truss] failures may be the result of defective truss *design* [or] defective *manufacture* of the trusses," (Crescent Opp'n Br. Ex. G (emphasis added)), indicating a potentially widespread problem; that AP Atlantic had informed Crescent that it could not perform the repairs within Crescent's demanded timeframe; that Crescent remained open to allowing AP Atlantic to perform or participate in the repair work before Crescent's end-of-summer deadline; and that SGH and Crescent's backup contractor, Summit, were able to put together and execute a plan for remedying the alleged truss defects that was, in fact, completed by mid-August 2015.

72. Diligence and promptness are relative concepts that necessarily implicate questions of reasonable effort and timeliness and resist definition by prescribed legal

rules. In light of the competing evidence identified above, the Court concludes that determining whether Crescent was able to self-correct due to AP Atlantic's failure to "commence and continue" correction "with diligence and promptness" cannot be accomplished by the application of clear legal principles or case law. Instead, that decision will require a careful weighing of multiple, case-specific facts. The question is thus one of fact to be answered by the factfinder at trial. *See Rheinberg-Kellerei GMBH v. Vineyard Wine Co.*, 53 N.C. App. 560, 566, 281 S.E.2d 425, 428 (1981) (noting whether a notification has been "prompt" must be determined on a case-by-case-basis "under all the circumstances"); *cf. Egan v. Guthrie*, 94 N.C. App. 307, 312, 380 S.E.2d 135, 138 (1989) ("The degree to which plaintiff exerted best efforts or reasonable efforts in trying to sell defendants' property is a question of fact to be properly decided by the trier of facts.").

73. For these same reasons, it is for the factfinder to determine whether Crescent afforded AP Atlantic a reasonable amount of time to cure. *Hardee's Food Sys., Inc. v. Hicks*, 5 N.C. App. 595, 599, 169 S.E.2d 70, 73 (1969) ("Reasonable time is generally conceived to be a mixed question of law and fact. If, from the admitted facts, the court can draw the conclusion as to whether the time is reasonable or unreasonable, by applying to them a legal principle or a rule of law, then the question is one of law. But if different inferences may be drawn, or circumstances are numerous and complicated, and such that a definite legal rule cannot be applied to them, then the matter should be submitted to the jury." (quoting *Apostle v. Acacia Mut. Life. Ins. Co.*, 208 N.C. 95, 98, 179 S.E. 444, 446 (1935))).

74. AP Atlantic also argues that Crescent's implemented repair plan, which Crescent offered AP Atlantic the chance to perform under, was not truly a plan designed to repair the trusses called for by the General Contract but instead a plan to outfit the Project with enhanced trusses. Viewing the record's contents in the light most favorable to Crescent, the Court concludes that the evidence concerning this issue reveals genuine issues of material fact that also prevent the entry of summary judgment in AP Atlantic's favor.

75. For these reasons, the Court concludes a genuine issue of material fact remains as to Crescent's breach of contract claim and denies the AP Parties' Motion to the extent it seeks complete dismissal of that claim.

### 2. The Availability of Consequential Damages

76. Having concluded that dismissal of Crescent's breach of contract claim against AP Atlantic is not appropriate at summary judgment, the Court next considers the AP Parties' alternative request that the Court "[strike], with prejudice, all claims for consequential damages sought by Crescent[.]" (AP Atl., Inc. and Adolfson & Peterson Constr., Inc.'s Mot. Summ. J. 2, ECF No. 322.)

77. In particular, the AP Parties challenge Crescent's claimed "Relocation and Operational Costs." (Crescent Opp'n Br. 12.) Crescent breaks down these damages, which amount to a total of $2,579,960.57, as follows:

(1) Hotel: $906,847.74 – Crescent provide[ed] temporary housing in hotels for students who renewed their leases.

(2) Shuttle & Storage: $253,319.18 – Because the students lost the ability to walk to campus once they were relocated, Crescent ensured the students

could safely get to campus by providing shuttles for the students . . . . Crescent also provided storage for their items.

(3) Relocation Stipend: $500,446.46 – Crescent further offered a $500 prepaid gift card and a $140 per week stipend to students opting to renew their leases.

(4) Attorneys' Fees: $10,604.75 – Crescent incurred [attorneys'] fees in relocating the students, dealing with unhappy students and parents, and responding to a student claim.

(5) Payroll/Contracted Staffing/Operational: $650,382.28 – Crescent incurred $276,000 in payroll and contracted staffing costs during the repair work for Greystar employees that were onsite managing the apartment complex while the repairs were going on. Crescent [also] incurred [other] operations costs during the truss repair work, including utilities, builder's risk insurance related to the truss construction work, a crisis communication hotline related to the truss failures, and costs for an inspection needed for [a] bank lender.

(Crescent Opp'n Br. 12–13 (citations omitted).)

78. The AP Parties argue that these expenses constitute consequential damages and that Crescent is not entitled to recover consequential damages for its breach of contract claim because both AP Atlantic and Crescent waived their right to such damages in Section 15.1.6 of the General Contract. In relevant part, Section 15.1.6 reads as follows:

> The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes (1) damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

(General Contract § 15.1.6.) The AP Parties contend that this language is unambiguous and should be enforced.

79. Crescent responds with several arguments. First, Crescent argues that none of the specific damages it seeks are waived by the General Contract, which Crescent contends contains an exhaustive and exclusive list of waived damages. Second, Crescent asserts that the entirety of the damages it seeks are direct, not consequential. Third, if the Court disagrees with Crescent's first two arguments, Crescent argues that the damages the AP Parties challenge are at most incidental damages and thus are not waived. Fourth, Crescent maintains that, at the very least, whether any of its damages are consequential and waived is a matter that should be left to the jury. Finally, Crescent argues that A&P has not moved for summary judgment on Crescent's claim on the Performance Guaranty and that Crescent is entitled to consequential damages under the Performance Guaranty, which does not include a waiver of such damages.

80. When a contract has been breached, the general rule is that "the injured party is entitled as compensation therefor to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed." *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 665, 464 S.E.2d 47, 59 (1995) (quoting *First Union Nat'l Bank v. Naylor*, 102 N.C. App. 719, 725, 404 S.E.2d 161, 164 (1991)). The injured party is entitled to damages based on this expectation interest, which is measured by "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other

loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." *Id.* Modern North Carolina jurisprudence recognizes a difference in these forms of loss and categorizes them as direct, incidental, and consequential. *See* N.C.P.I.-Civil 503.21, 503.70; *see also Pleasant Valley Promenade*, 120 N.C. App. at 671, 464 S.E.2d at 62.

81. Crescent does not appear to dispute the AP Parties' basic point that the General Contract limits Crescent from recovering certain consequential damages in this case. That approach is well-advised. The Supreme Court of North Carolina has noted that the fundamental freedom of parties to contract as they see fit allows a party to, in normal circumstances, waive "[a]ny right, whether statutory or constitutional," to which it is entitled, *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 194 n.6, 437 S.E.2d 374, 381 n.6 (1993), and has long held that parties may limit their liability for losses ordinarily categorized as consequential damages, *Lambert Hoisting Engine Co. v. Paschal*, 151 N.C. 27, 30, 65 S.E. 523, 524 (1909) (holding a party may contractually exempt itself from liability for loss of prospective profits caused by a delay in performance).

82. The General Contract clearly states that Crescent and AP Atlantic waived their "[c]laims against each other for consequential damages arising out of or relating to" the General Contract. (General Contract § 15.1.6.) The Court will enforce this contract as written, and thus concludes that Crescent has waived its ability to recover consequential damages against AP Atlantic. *See Severn Peanut Co. v. Indus. Fumigant Co.*, 807 F.3d 88, 92 (4th Cir. 2015) ("[C]onsequential damage[s]

limitations . . . appear to be commonly-enforced tools of doing business used throughout North Carolina and many other states.").

83. Crescent's first argument attempts to limit the effect of Section 15.1.6 by suggesting that the section's use of the word "includes" implies that Crescent has waived only those categories of damages specifically referenced in the first subsection relating to the waiver by the "Owner." The Court disagrees. "[T]he term 'includes' is ordinarily a word of enlargement and not of limitation," and in interpreting the plain text of statutes, North Carolina courts have consistently held that the "definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions." *Jackson v. Charlotte Mecklenburg Hosp. Auth.*, 238 N.C. App. 351, 357, 768 S.E.2d 23, 27 (2014) (quoting *N.C. Tpk. Auth. v. Pine Island, Inc.*, 265 N.C. 109, 120, 143 S.E.2d 319, 327 (1965)). Applying this reasoning here, the Court concludes that the word "includes," as used in Section 15.1.6, does not limit the categories of consequential damages waived by Crescent to those specifically listed.

84. Having concluded that Crescent has waived its right to all consequential damages under the General Contract, the Court next examines the category of damages the AP Parties specifically challenge at summary judgment—the $2,579,960.57 that Crescent seeks for "student relocation and operation costs." (Crescent Opp'n Br. 12.) The AP Parties argue that these costs, which Crescent characterizes as "its best efforts to keep tenants by providing relocation packages," (Crescent Opp'n Br. 12), cannot be described as anything other than consequential damages and thus that Crescent should be barred from recovering for these expenses.

85. It is in response to this specifically challenged category of damages that Crescent raises its second argument, asserting that the claimed "student relocation and operation costs" flow naturally and necessarily from AP Atlantic's breach of the General Contract and thus are direct damages. Again, the Court disagrees.

86. Direct damages "are such [damages] as might accrue to any person similarly injured," *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 92, at *30 (N.C. Super. Ct. Oct. 3, 2017) (citing *Penner v. Elliott*, 225 N.C. 33, 35, 33 S.E.2d 124, 126 (1945)), and are a "natural, and proximate result" of a breach of contract, *Lamm v. Shingleton*, 231 N.C. 10, 14, 55 S.E.2d 810, 812 (1949); N.C.P.I.-Civil 503.21 ("Direct damages are the economic losses that usually or customarily result from a breach of contract."). In the context of construction contracts, our courts have adhered to the rule that direct damages are measured by "(1) the difference between the value of the building as warranted or contracted for and its value as actually built, [or] (2) the cost of repairs required to bring the property into compliance with the warranty or contract." *Warfield v. Hicks*, 91 N.C. App. 1, 11, 370 S.E.2d 689, 695 (1988); *see Robbins v. C.W. Myers Trading Post, Inc.*, 251 N.C. 663, 666, 111 S.E.2d 884, 887 (1960). This is because, as our Supreme Court explained nearly fifty years ago, "[t]he fundamental principle which underlies the decisions regarding the measure of damages for defects or omissions in the performance of a building or construction contract is that a party is entitled to have what he contracts for or its equivalent." *Robbins*, 251 N.C. at 666, 111 S.E.2d at 887; *see also Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) ("A plaintiff is seeking [direct] damages when he tries to recover 'the value of the very

performance promised.' " (quoting 3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.2(3) (1993))).

87.    The "student relocation and operation costs" damages Crescent seeks cannot be accurately characterized as direct damages.  These expenses are not such damages "as might accrue to any person similarly injured," *Penner*, 225 N.C. at 35, 33 S.E.2d at 126, but are particular to Crescent in this case.  Crescent argues that "[d]amages analogous to those" it now claims "have been held to be direct damages, rather than consequential" damages, (Crescent Opp'n Br. 22), but the cases Crescent cites in support of this argument do not support the proposition that expenses incurred in attempting to retain residents should be considered as directly resulting from the breach of a construction contract,[3] and North Carolina law does not support that position, *see Robbins*, 251 N.C. at 666, 111 S.E.2d at 887; *Warfield*, 91 N.C. App. at 11, 370 S.E.2d at 695 (setting out the two recognized methods for measuring direct damages for the breach of a construction contract in North Carolina).  The Court thus concludes that Crescent's "student relocation and operation costs" are not direct damages resulting from any alleged breach of contract by AP Atlantic.

---

[3] *See Comstock Potomac Yard, L.C. v. Balfour Beatty Constr., LLC*, 694 F. Supp. 2d 468, 491 (E.D. Va. 2010) (holding expenses related to additional labor, administrative work, cleaning, and security needed to address incomplete work to be direct damages); *Winforge, Inc. v. Coachmen Indus., Inc.*, No. 1:06-cv-619-SEB-JMS, 2008 U.S. Dist. LEXIS 66250, at *34–36 (S.D. Ind. Aug. 27, 2008) (concluding loss of initial investment in real estate and "increased interest costs due to an extended loan term during construction delays" were direct damages); *Tenn. Gas Pipeline Co. v. Technip USA Corp.*; No. 01-06-00535-CV, 2008 Tex. App. LEXIS 6419, at *21–23 (Tex. App. Aug. 21, 2008) (holding expenses resulting from project delay, including "labor, travel, environmental contractors, . . . inspectors, purchase and supply of additional construction consumables, costs for hauling wastewater from the site, and services and utilities" constituted direct damages).

88.     Crescent's third argument, which attempts to characterize the challenged expenses as incidental damages, is likewise largely unavailing.

89.     The legal distinctions between incidental and consequential damages under North Carolina law are, at best, murky, particularly outside the context of the sale of goods. *See, e.g.*, *Harrington Mfg. Co. v. Logan Tontz Co.*, 40 N.C. App. 496, 505, 253 S.E.2d 282, 287 (1979); *see also* N.C.G.S. § 25-2-710 ("Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.")  When discussed, the two are often mentioned together, with little attempt to draw a distinction, *Pleasant Valley Promenade*, 120 N.C. App. at 665, 464 S.E.2d at 59 (describing "any other loss, including incidental or consequential loss, caused by the breach," as damages plaintiff may recover), and historically both have been lumped together as "special damages," *see Penner*, 225 N.C. at 35, 33 S.E.2d at 126; *Piedmont Plastics, Inc. v. Mize Co.*, 58 N.C. App. 135, 140, 293 S.E.2d 219, 223 (1982) ("Incidental and consequential damages are special damages, those which do not necessarily result from the wrong." (internal quotation marks omitted)).

90.     However, our Court of Appeals has discussed incidental damages as a separate category of damages available in common law breach of contract cases, *see J.T. Russell & Sons, Inc. v. Silver Birch Pond LLC*, 217 N.C. App. 290, 297–98, 721 S.E.2d 699, 704–05 (2011), and North Carolina's pattern jury instructions suggest

incidental damages may be awarded in a myriad of contract cases, including where the contract in question relates to construction, N.C.P.I.-Civil 503.70 ("The right to incidental damages applies in almost every breach of contract setting (*e.g.*, construction contracts, contracts for the purchase of real estate, etc.).").  The pattern jury instructions further provide examples of incidental damages, including "costs reasonably incurred by the plaintiff in response to the defendant's breach" and "costs reasonably incurred by the plaintiff for the purpose of minimizing the injury resulting from the defendant's breach."  *Id.*  The Restatement (Second) of Contracts, which North Carolina courts view as persuasive authority on matters of contract law,[4] also recognizes incidental damages as a distinct category.  Restatement (Second) of Contract § 347 cmt. c (Am. Law. Inst. 1981) ("Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction.").

91.    Consequential damages, on the other hand, are those other damages "which might have been within the contemplation of the parties at the time the contract was made," *Chris v. Epstein*, 113 N.C. App. 751, 754, 440 S.E.2d 581, 583 (1994), and are "claimed to result as a secondary consequence of the defendant's non-performance," *Pleasant Valley Promenade*, 120 N.C. App. at 671, 464 S.E.2d at 62 (quoting 3 Dan B. Dobbs, *Law of Damages* § 12.4(1) (2d ed. 1993) [hereinafter "Dobbs on Damages"]).

---

[4]  *See, e.g.*, *Vogel v. Reed Supply Co.*, 277 N.C. 119, 127–28, 177 S.E.2d 273, 278 (1970) (adopting the framework for distinguishing intended and incidental beneficiaries used in the Restatement (Second) of Contracts); *Schwarz v. St. Jude Med., Inc.*, 802 S.E.2d 783, 789–90 (N.C. Ct. App. 2017) (citing the Restatement (Second) of Contracts at length regarding mutual assent and contract formation).

They "do not flow directly and immediately from an injurious act but . . . result indirectly" from it. *Consequential Damages*, Black's Law Dictionary (8th ed. 2004).

92. Courts in many jurisdictions have grappled with distinguishing incidental and consequential damages, often under Article 2 of the Uniform Commercial Code (the "UCC"). The prevailing and often-cited articulation of the difference between the two comes from Judge Neaher in *Petroleo Brasileiro, S.A. Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503 (E.D.N.Y. 1974):

> While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting

*Id.* at 508–09 (first citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Reprint 145 (1854); then citing 51 N.Y. Jur. Sales § 236 (1966)). This distinction led Judge Neaher to conclude that expenses the plaintiff paid in penalties were not incidental damages because they stemmed from the plaintiff's dealings with other parties who were not a party to the breached contract. *Id.* at 509. Numerous courts have cited *Petroleo Brasileiro, S.A. Petrobras* for this rule. *See, e.g.*, *Jelen & Sons, Inc. v. Bandimere*, 801 P.2d 1182, 1186 (Colo. 1990); *Superior, Inc. v. Behlen Mfg. Co.*, 738 N.W.2d 19, 26 (N.D. 2007); *Sprague v. Sumitomo Forestry Co.*, 709 P.2d 1200, 1206 (Wash. 1985) (ruling that loss incurred due to nonbreaching party's delay in performing a contract for a third party was not properly characterized as incidental damage and stating

"[t]he fact that [defendant's] conduct proximately caused [plaintiff's] loss is irrelevant to this analysis" and that "[t]he focus is upon losses arising within the scope of the immediate contract").

93.     While these cases concern contracts for the sale of goods, the standard they provide for identifying and distinguishing incidental and consequential damages is reasonable and appears consistent with North Carolina common law.  *See* N.C.P.I.-Civil 503.70 (defining incidental damages by reference to costs associated with performance under the contract or minimizing the loss resulting from the defendant's breach of the contract); *see also Pleasant Valley Promenade*, 120 N.C. App. at 671–72, 464 S.E.2d at 62–63.  There is thus significant persuasive authority to support defining incidental damages as expenses incurred in mitigating and dealing with losses arising within the scope of the immediate contract and consequential damages as "losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."  *Petroleo Brasileiro*, 372 F. Supp. at 508; *see Sprague*, 709 P.2d at 1206; *see also First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*, No. 13-CV-592S, 2016 U.S. Dist. LEXIS 67705, at *22–24 (W.D.N.Y. May 23, 2016).

94.     The Court also finds the North Carolina Court of Appeals' decision in *Pleasant Valley* instructive.  In that case, a shopping center owner and a department store entered into an agreement which required the department store to operate in the shopping center for a set number of years.  *Pleasant Valley Promenade*, 120 N.C.

App. at 654, 464 S.E.2d at 52. The store breached the agreement by closing early. *Id.* The owner brought a breach of contract action and sought damages for (i) harm to the overall probability of success of the center; (ii) harm to the fair market value of the center; and (iii) harm to the center's ability to attract and retain non-anchor tenants and a corresponding reduction in customer traffic and revenue. *Id.* at 670, 464 S.E.2d at 61–62.

95. After addressing whether the owner could claim such losses, the *Pleasant Valley* court examined whether these losses were a "damages remedy implied by law or, alternatively, a consequential damage measure." *Id.* at 671, 464 S.E.2d at 62. The court noted that because the department store actually owned the land on which it operated, and therefore paid the owner no rent, the department store's nonperformance did not "*directly* cause financial harm" to the owner. *Id.* at 671–72, 464 S.E.2d at 62. The court explained that all of the damages claimed by the owner, including harm to the center's ability to retain non-anchor tenants, "occurred, if at all, as a 'secondary consequence of defendant's non-performance.' " *Id.* at 672, 464 S.E.2d at 62–63 (quoting Dobbs on Damages § 12.4(1)). The court therefore concluded that the damages sought were special damages under North Carolina law. *Id.* at 672, 464 S.E.2d at 63. The court did not expressly characterize the owner's losses as belonging to the consequential subset of special damages in its conclusion, but as between a "damages remedy implied by law or . . . a consequential damage measure," the court clearly held that the owner's claimed losses constituted the latter. *See id.* at 671–72, 464 S.E.2d at 62–63.

96. After reviewing *Pleasant Valley*, the case law addressing incidental damages under the UCC, and the undisputed facts of this case, the Court concludes that Crescent's expenses for hotels, shuttles and storage, relocation stipends and gift cards, and attorneys' fees incurred in connection with "dealing with unhappy students and parents" and a student claim, (Crescent Opp'n Br. 13), cannot be characterized as incidental damages. These claimed expenses were not incurred in addressing, remedying, or mitigating the immediate injury caused by AP Atlantic's alleged breach of contract—i.e., Crescent receiving a nonconforming apartment complex—and did not arise within the scope of the transaction between Crescent and AP Atlantic. Rather, these expenses stem "from losses incurred by [Crescent] in its dealings" with "third parties," *Petroleo Brasileiro*, 372 F. Supp. at 508, particularly, Crescent's "efforts to keep tenants," whether that meant persuading student tenants not to break their leases or incentivizing them to "renew their leases," (Crescent Opp'n Br. 12).

97. Crescent essentially argues that although it has waived any right to recover losses to income, profit, business, and reputation as forms of consequential damages, (*see* General Contract § 15.1.6), it should nonetheless be able to recover its expenses incurred in mitigating those unrecoverable losses. The Court cannot agree. Crescent's hotel, shuttle and storage, relocation stipend and gift card, and attorneys' fees expenses are necessarily a "secondary consequence of" AP Atlantic's alleged "non-performance," *Pleasant Valley Promenade*, 120 N.C. App. at 672, 464 S.E.2d at 62–63, and were not incurred in addressing breaches within the immediate scope of

Crescent and AP Atlantic's contract. Thus, if recoverable at all, these claimed damages would be categorized as consequential, and not incidental, damages. *See id.* at 671–72, 464 S.E.2d at 62–63 (determining loss in value partially caused by owner's decreased ability to attract tenants for shopping center was a "consequential damage measure"); *see also Petroleo Brasileiro*, 372 F. Supp. at 508; *Sprague*, 709 P.2d at 1206.

98. The Court therefore concludes that no genuine issue of material fact remains as to Crescent's expenses for hotel, shuttle and storage, relocation stipend and gift cards, or attorneys' fees and that the AP Parties are entitled to summary judgment on this issue. Crescent shall not be allowed to recover consequential damages in this action on its breach of contract claim against AP Atlantic and shall be particularly precluded from recovering the above claimed damages as a result.

99. The same cannot be said, however, of Crescent's claimed $650,382.28 in "Payroll/Contracted Staffing/Operational" costs. (Crescent Opp'n Br. 13.) Crescent characterizes these damages as payroll and staffing costs for property management employees that were managing the Project while repairs were underway, as well as expenses related to (i) utilities and builder's risk insurance related to repair work, (ii) a hotline related to truss failures, and (iii) costs for inspections required by a lender. (Crescent Opp'n Br. 13.) Based on the evidence of record, the Court is unable to conclude as a matter of law whether such expenses should be categorized as incidental (i.e., costs incurred to mitigate the immediate injury) or consequential (i.e., costs incurred as a secondary consequence), and thus cannot enter summary

judgment as to these damages. *See, e.g.*, *KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 147 (E.D.N.Y. 2014) (denying motion for summary judgment where it could not be determined as a matter of law whether damages were consequential or incidental). The Court will therefore deny the AP Parties' Motion to the extent it seeks relief as to this category of Crescent's damages.

100. Finally, contrary to Crescent's argument that A&P has not moved for summary judgment on Crescent's claim under the Performance Guaranty, the Court concludes that A&P has so moved and that the Court's ruling on Crescent's waiver of consequential damages under the General Contract prevents Crescent from recovering such consequential damages from A&P. As to the first point, the AP Parties' Motion clearly shows that both AP Atlantic and A&P moved and that both asked the Court to "strike, with prejudice, *all claims for consequential damages sought by Crescent* because it expressly waived the right to recover such damages in its contract." (AP Atl., Inc. and Adolfson & Peterson Constr., Inc.'s Mot. Summ. J. 2.)

101. As to the effect of Crescent's waiver of consequential damages, the Performance Guaranty unambiguously states that A&P agreed to pay "any sum that may be payable in consequence of the nonperformance by [AP Atlantic] . . . of any of the terms, provisions, conditions, obligations and agreements contained in the Agreement." (Performance Guaranty ¶ 2.) The General Contract waived Crescent's right to recover consequential damages, and such damages would thus not be "payable in consequence of" AP Atlantic's nonperformance. Therefore, the Court further concludes that Crescent shall not be permitted to recover consequential

damages on its claim against A&P under the Performance Guaranty and shall particularly be precluded from recovering from A&P Crescent's expenses for hotel, shuttle and storage, relocation stipend and gift cards, or attorneys' fees. The AP Parties' Motion will therefore be granted to this extent.

B.    Negligence and Contribution Claims Against and Among Subcontractors

102. Madison, Trussway, Sears, and Interior Distributors ask the Court to enter summary judgment in their favor on the negligence claims asserted against them by AP Atlantic and/or A&P. Trussway and Sears also move the Court for summary judgment on the claims for negligence and contribution asserted against them by the other first- or lower-tier subcontractors. Additionally, at oral argument T.A. Kaiser requested, to the extent the Court concludes that the negligence claims against the other subcontractors should be dismissed, that the Court dismiss those negligence claims against T.A. Kaiser as well. For the reasons stated in this section, the Court concludes that each negligence and contribution claim asserted against and among AP Atlantic's first- and lower-tier subcontractors fails as a matter of law and should be dismissed.

103. Of the various arguments made against these claims, those asserted by Sears and Interior Distributors are the most persuasive. Sears and Interior Distributors both note that the negligence claims asserted against them are purely derivative and pleaded based on a theory of active and passive negligence, i.e., in the event the claimant is found liable to another party in this action, the claimant alleges such liability was the proximate result of active negligence on the part of Sears or

Interior Distributors, respectively. Sears and Interior Distributors contend these claims are, despite their captioning, implied-in-law indemnity claims and that such claims are unavailable in this case because there is no underlying injury sounding in tort, citing *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 587 S.E.2d 470 (2003). Sears and Interior Distributors further argue that this lack of an underlying tortious injury means the parties in this case are not joint tortfeasors and cannot seek contribution from each other. The Court agrees with both of these arguments and concludes that they provide the correct resolution to every negligence and contribution claim brought by the AP Parties or asserted between the subcontractors.

104. "There exists in North Carolina a common law right to indemnification for a passively negligent tort-feasor from an actively negligent tort-feasor, for injuries caused to third parties." *Id.* at 41, 587 S.E.2d at 475 (citing *Edwards v. Hamill*, 262 N.C. 528, 138 S.E.2d 151 (1964)). Tort law provides for this right, *Land v. Tall House Bldg. Co.*, 165 N.C. App. 880, 884, 602 S.E.2d 1, 3 (2004), although it is "more an equitable remedy than an action in and of itself," *Kaleel Builders, Inc.*, 161 N.C. App. at 41, 587 S.E.2d at 475. Discussed sometimes as "indemnification implied-in-law," *id.* at 41, 587 S.E.2d at 475, or a "contract implied in law," *Hunsucker v. High Point Bending & Chair Co.*, 237 N.C. 559, 563–64, 75 S.E.2d 768, 771 (1953), the remedy exists between parties under only the following circumstances:

> (1) they are jointly and severally liable to the plaintiff, and (2) either (a) one has been passively negligent but is exposed to liability through the active negligence of the other or (b) one alone has done the act which produced the injury but the other is derivatively liable for the negligence of the former.

*Edwards*, 262 N.C. at 531, 138 S.E.2d at 153 (citations omitted).

105. For a party to be entitled to implied-in-law indemnity, there must "be an underlying injury sounding in tort." *Kaleel Builders, Inc.*, 161 N.C. App. at 41, 587 S.E.2d at 475. "The party seeking indemnity must have imputed or derivative liability for the tortious conduct from which indemnity is sought." *Id.* This requirement for an underlying tortious injury has limited the availability of the implied-in-law indemnification remedy in construction cases, where North Carolina's economic loss rule confines many claims to the law of contract. *See Tall House Bldg. Co.*, 165 N.C. App. at 884, 602 S.E.2d at 3–4; *Kaleel Builders, Inc.*, 161 N.C. App. at 41–42, 587 S.E.2d at 476.

106. Similarly, under N.C.G.S. § 1B-1, which governs the right of parties to contribution in North Carolina, "there is no right to contribution from one who is not a joint tort-feasor." *Kaleel Builders, Inc.*, 161 N.C. App. at 43, 587 S.E.2d at 477; *see* N.C.G.S. § 1B-1. "Therefore, by [the] clear language of the statute, [a claimant] is not entitled to contribution for a claim sounding only in contract." *Kaleel Builders, Inc.*, 161 N.C. App. at 43, 587 S.E.2d at 477. As with implied-in-law indemnification, this restriction, combined with the economic loss rule, will often limit the ability of a party to bring a contribution claim in the context of a construction dispute. *See Tall House Bldg. Co.*, 165 N.C. App. at 883, 602 S.E.2d at 3; *Kaleel Builders, Inc.*, 161 N.C. App. at 43, 587 S.E.2d at 477.

107. After a review of relevant case law, the Court concludes that this case is nearly on all-fours with the cited *Tall House* and *Kaleel Builders* cases. In both of those cases, the Court of Appeals applied North Carolina's economic loss rule and

concluded that a general contractor's failure to properly perform under a construction contract, even if due to negligence, did not give rise to an underlying injury in tort. *See Tall House Bldg. Co.*, 165 N.C. App. at 883, 602 S.E.2d at 3 ("We believe that Tall House failed to perform the terms of the contract [with the owners] and this failure resulted in injury to the subject matter of the contract, the home.  Thus, the law of contract, not the law of negligence, defines the obligations and remedies of the parties."); *Kaleel Builders, Inc.*, 161 N.C. App. at 42, 587 S.E.2d at 476 ("However, there is no *prima facie* tort case made out to allege negligence not otherwise covered by contractual obligations between the parties.  On that basis alone, without determining whether there [are] sufficient allegations in the complaint of imputed or derivative liability, we hold that plaintiff has not stated a claim for an equitable right under the implied-in-law theory of indemnity. . . . [W]e acknowledge no negligence claim where all rights and remedies have been set forth in the contractual relationship.").  The court therefore held that the general contractor in each case could not assert negligence-based indemnification claims or contribution claims against other parties.  *Tall House Bldg. Co.*, 165 N.C. App. at 883–84, 602 S.E.2d at 3–4; *Kaleel Builders, Inc.*, 161 N.C. App. at 41–43, 587 S.E.2d at 476–77.

108.  Reviewing the parties' pleadings, the Court concludes that each negligence claim asserted in this case is, in fact, a claim for implied-in-law indemnification.  (*See, e.g.*, Am. Compl. ¶ 194 (alleging that, to the extent AP Atlantic is liable to Crescent, AP Atlantic's liability is "both factually and proximately caused by the . . . negligence of Defendant Trussway and the defectiveness of the wooden floor trusses that it

designed and manufactured").)[5] Thus, like the general contractors' implied-in-law indemnity claims in *Tall House* and *Kaleel Builders*, each of the parties' negligence-based indemnity claims in this case must be grounded on an underlying injury sounding in tort to survive. Each of these claims, as well as each asserted contribution claim, fails because there is no such injury in this case.

109. AP Atlantic agreed to build the Project by entering into the General Contract with Crescent. A&P signed the Performance Guaranty as part of this transaction. Crescent has sued AP Atlantic for breach of contract, alleging defects in

---

[5] (*See also* Am. Third-Party Compl. 16 ("AP Atlantic seeks and is entitled to recover damages from [Interior Distributors] . . . for any amounts that AP Atlantic may be liable to Crescent . . . as a result of the negligence of [Interior Distributors.]"); A&P Third-Party Compl. 34–35, 43, 52, 56 ("[I]n the event it is determined that A&P is liable to [Crescent] under the terms of the Guaranty, which is also hereby expressly denied, said liability is attributable to the negligence of Madison[.] . . . [I]n the event it is determined that A&P is liable to [Crescent] under the terms of the Guaranty, . . . said liability is attributable to the negligence of Sears[.] . . . [I]n the event it is determined that A&P is liable to [Crescent] under the terms of the Guaranty, . . . said liability is attributable to the negligence of [T.A.] Kaiser[.] . . . [I]n the event it is determined that A&P is liable [to Crescent], . . . then Trussway is liable to A&P for its negligent design and negligent manufacture of defective metal plate connected floor trusses[.]"); Madison Answer and Cross-cls. 13, 17 ("Any fault or negligence by Madison (which negligence or fault is denied) was passive and secondary in light of the primary and active fault or negligence of Trussway. . . . Any fault or negligence by Madison (which negligence or fault is denied) was passive and secondary in light of the primary and active fault or negligence of T.A. Kaiser."); Madison Cross-Cls. Against Sears 13 ("Madison seeks and is entitled to recover damages from Sears for any amounts that Madison may be liable to Third Party Plaintiff and/or others related to this action as a result of the negligence of Sears."); Trussway Cross-cls. 10 ("Any fault or negligence by Trussway (which negligence or fault is expressly denied) was passive and secondary in light of the primary and active fault or negligence of T.A. Kaiser."); Trussway Mfg., Inc.'s Third-Party Claim Against Sears Contract, Inc. ¶ 17 ("Trussway seeks and is entitled to recover damages from Sears for any amounts that Trussway may be liable to Plaintiff and/or others related to this action as a result of the negligence of Sears."); T.A. Kaiser Cross-cls. Against Madison 6 ("Any fault or negligence by T.A. Kaiser, which is again expressly denied, was passive and secondary in light of the primary and active fault [or] negligence of Madison."); T.A. Kaiser Cross-cls. Against Trussway 5 ("Any fault or negligence by T.A. Kaiser, which is again expressly denied, was passive and secondary in light of the primary and active fault [or] negligence of Trussway and/or other parties.").)

the Project's construction, and A&P for enforcement of the Performance Guaranty. Both claims arise out of contractual obligations. *See Emerald Portfolio, LLC v. Outer Banks/Kinnakeet Assocs., LLC*, 249 N.C. App. 246, 251, 790 S.E.2d 721, 725 (2016) ("A guaranty is an obligation in contract[.]"); *Tall House Bldg. Co.*, 165 N.C. App. at 883, 602 S.E.2d at 3. Under the economic loss rule, any alleged breach of those obligations, even if due to negligence, will not provide Crescent with a tort action against AP Atlantic or A&P. *Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992) ("Absent the existence of a public policy exception, as in the case of contracts involving a common carrier, innkeeper or other bailee, a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." (citations omitted)).

110. The practical effect of Crescent's inability to bring a tort claim against the AP Parties on the facts alleged here is that there is no underlying injury sounding in tort on which the AP Parties may ground their various negligence-based indemnification claims against Madison, Trussway, T.A. Kaiser, Sears, and Interior Distributors. Similarly, there is no underlying injury in tort on which the various negligence-based indemnity and contribution claims among the first- and lower-tier subcontractors may be maintained. The law of contract, not the law of tort, defines the parties' obligations.

111. The parties resisting dismissal of their own negligence-based indemnity and/or contribution claims make various arguments against this conclusion. None is persuasive, and the Court chooses to address as illustrative only the argument made by the AP Parties.

112. The AP Parties argue that their negligence-based indemnity claims are proper because the claims are asserted against parties with which AP Atlantic or A&P had no contractual relationship, relying on *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 637, 643 S.E.2d 28, 29 (2007). *Lord*, however, did not involve indemnification or contribution claims and dealt instead with a direct negligence claim. *Id.* at 640, 643 S.E.2d at 31 (distinguishing *Tall House* because *Tall House* "related only to the questions of whether the contractor in question could bring a contribution or indemnification claim against [a] stucco manufacturer"). In the present case, it is not the absence of a contract between the AP Parties and the various subcontractors against which they assert tort claims that is dispositive. Rather, it is the absence of an underlying injury sounding in tort that bars the AP Parties' tort-based claims.

113. Consistent with the above, the Court concludes that no genuine issue of material fact remains as to the various negligence and contribution claims asserted against Madison, Trussway, T.A. Kaiser, Sears, and Interior Distributors, and that summary judgment is appropriate on all such claims. The Court will therefore grant the parties' respective motions requesting such relief. Further, to the extent any implied-in-law indemnity claims or contribution claims that were not the subject of a

motion remain pending against these parties, the Court shall *sua sponte* dismiss those claims for the reasons stated herein. *See Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 687–88, 821 S.E.2d 360, 370 (2018) (upholding trial court's decision to *sua sponte* grant summary judgment where the basis for granting a motion for summary judgment concomitantly provided complete defense to claim not moved on).

C.     Joint and Several Liability for Breach of Contract

114.    Both Madison and T.A. Kaiser seek summary judgment on AP Atlantic's request that Madison, Trussway, and T.A. Kaiser be held jointly and severally liable for AP Atlantic's damages.

115.    AP Atlantic makes this request in its Amended Complaint, asserting that Madison's, Trussway's, and T.A. Kaiser's "breaches of contract and/or negligence . . . occurred under circumstances where each Truss Defendant[6] knew or should have known that the independent acts of each Truss Defendant would both factually and proximately cause the Project's failure(s) and deficiencies, and" AP Atlantic's damages, (Am. Compl. ¶ 229), and that these "breaches of contract and/or negligence . . . concurred in both factually and proximately causing the Project's failure(s) and deficiencies," (Am. Compl. ¶ 230).  On the basis of these allegations, AP Atlantic alleges Madison, T.A. Kaiser, and other parties "are jointly and severally liable to [AP Atlantic] for all of its damages prayed for in [its Amended] Complaint."

---

[6] The "Truss Defendants," as used in AP Atlantic's pleading, were Madison, Trussway, T.A. Kaiser, and two other parties who have since been dismissed from this lawsuit. (Am. Compl. ¶ 228.)

(Am. Compl. ¶ 230.) Madison and T.A. Kaiser separately argue that such joint and several liability is inappropriate in this case.

116. Madison contends that AP Atlantic may not hold it jointly and severally liable with other third-party defendants in this case because joint and several liability is available only as to a group of defendants (i) who have acted in concert to commit a wrong or (ii) who have committed separate wrongs producing a single, indivisible injury. As to the first of these circumstances, Madison argues the evidence here shows no sign of any party acting in concert with another to intentionally damage the Project's floor trusses. As to the second, Madison asserts that AP Atlantic has not suffered a single indivisible injury, pointing to SGH's final expert report, which documented specific instances of different defects with different likely causes. (SGH Expert Report 14.) Madison contends these findings show that the Project's trusses have not suffered indivisible damage but "multiple different instances of separate damage with varying degrees of severity related to different events." (Madison Constr. Grp., Inc.'s Reply Br. AP Atl. and Adolfson & Peterson, Inc. Supp. Mot. Summ. J. 11, ECF No. 421.)

117. T.A. Kaiser echoes some of Madison's points but goes a step beyond, arguing that "there is no support under the law for the imposition of joint and several liability based upon an alleged breach of contract." (Third-Party Def. T.A. Kaiser's Br. Supp. Mot. Partial Summ. J. 9 [hereinafter "Kaiser Br. Supp. Summ. J."], ECF No. 329.) As a result, T.A. Kaiser requests that the Court enter an order "limiting AP Atlantic's contractual claims against it to any damages which are proven to have been caused

by T.A. Kaiser, subject to the defense that AP Atlantic was also negligent." (Kaiser Br. Supp. Summ. J. 9.)

118. AP Atlantic responds to these separate arguments with a mixture of the following contentions. First, AP Atlantic asserts that if it shows that a "contractor materially deviated from [any] specifications, the burden of proof as to causation . . . shift[s] to the contractor," quoting *Charlotte v. Skidmore, Owings & Merrill*, 103 N.C. App. 667, 680, 407 S.E.2d 571, 579 (1991). (Def. AP Atl., Inc. and Adolfson & Peterson Constr., Inc.'s Resp. Madison Constr. Grp., Inc.'s Mot. Summ. J. 8 [hereinafter "AP Opp'n Madison Mot. Summ. J."], ECF No. 379.) Second, apparently referencing the fact that its breach of contract claims against Madison and T.A. Kaiser include a request for contractual indemnification, AP Atlantic also argues that it may be indemnified by its subcontractors even though other parties were also negligent, citing *Weaver Cooke Construction, LLC v. Stock Bldg. Supply, LLC*, No. 5:14-CV-537-BR, 2016 U.S. Dist. LEXIS 109490 (E.D.N.C. Aug. 12, 2016). Third, AP Atlantic argues that issues of causation should be left to the jury and that Madison's assertion that no "single harm" occurred in this case is untrue, characterizing the alleged injury for which Crescent seeks recovery as "damage *to the trusses*." (AP Opp'n Madison Mot. Summ. J. 9 n.4.) Finally, in response to T.A. Kaiser's argument, AP Atlantic argues that the paragraphs alleging joint and several liability in its Amended Complaint "consist of mere allegations and do not assert a cause of action" and therefore are not an appropriate target for a summary judgment motion. (Br. AP Atl., Inc. and Adolfson & Peterson, Inc. Opp'n T.A. Kaiser Heating

& Air, Inc.'s Mot. Summ. J. 6 [hereinafter "AP Opp'n T.A. Kaiser Mot. Summ. J."], ECF No. 372.)

119. As a general rule, North Carolina law allows for joint and several liability "when (1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury." *GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 235, 752 S.E.2d 634, 650 (2013) (citing *Bost v. Metcalfe*, 219 N.C. 607, 610, 14 S.E.2d 648, 651 (1941)). After a review of the record at summary judgment, the Court agrees with Madison that there is no evidence of a concerted effort between by Madison, T.A. Kaiser, or others to damage the Project's trusses or otherwise cause the alleged defects. *See id.* ("Concerted action is when 'two or more persons unite or intentionally act in concert in committing a wrongful act, or participate therein with common intent.'" (quoting *Garrett v. Garrett*, 228 N.C. 530, 531, 46 S.E.2d 302, 302 (1948))).

120. The Court also notes that AP Atlantic's only claims against Madison and T.A. Kaiser are breach of contract claims. Consequently, the remaining question for the Court is whether joint and several liability may be applied to Madison or T.A. Kaiser in the event it is determined that their alleged breaches of contract gave rise to an indivisible injury. *See id.* As to this issue, the Court concludes it need not address the evidentiary arguments advanced by Madison and AP Atlantic about whether a single injury occurred in this case. Rather, after careful consideration, the Court agrees with T.A. Kaiser that AP Atlantic may not hold its subcontractors jointly and severally liable for merely breaching independent contracts.

121. Generally under North Carolina law, a plaintiff is entitled to compensatory damages for breach of contract only when he offers "evidence sufficient to satisfy the jury by the greater weight thereof that he has suffered substantial damage, naturally and proximately caused by the breach." *Bowen v. Fidelity Bank*, 209 N.C. 140, 144, 183 S.E. 266, 268 (1936). In determining who is liable for such damages, courts have long recognized joint and several liability between joint and several obligors on a contract. *See Rufty v. Claywell, Powell & Co.*, 93. N.C. 306, 308–09 (1885) (explaining that contracts may be joint, several, or joint and several). As far as the Court's research shows, however, North Carolina case law has not addressed the availability of joint and several liability in the context of multiple parties who, without any concerted action, breach *separate* contracts and thereby cause a single injury to a claimant.

122. Of the other jurisdictions that have considered how to allot liability in the context of concurrent breaches of contract or breach of contract cases where multiple factors may have resulted in damages, Minnesota and Illinois have adopted a rule most comparable to what AP Atlantic seeks here. The Minnesota Supreme Court has described this rule as follows:

> Where A and B owe contract duties to C under separate contracts, and each breaches independently, and it is not reasonably possible to make a division of the damage caused by the separate breaches closely related in point of time, the breaching parties, even though they acted independently, are jointly and severally liable.

*Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983); *see also Insureone Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1030 (Ill. App. Ct. 2012) (citing *Lesmeister*

and concluding that the trial court did not err in applying joint and several liability to defendants for concurrent breaches of contract).

123. Other courts have not been so keen to apply joint and several liability within the boundaries of contract-centric litigation. *See BFGC Architects Planners, Inc. v. Forcum/Mackey Constr., Inc.*, 14 Cal. Rptr. 3d 721, 724 (Cal. Ct. App. 2004) ("The only allegations of defendants' misconduct are based on their alleged breach of contract, despite plaintiff's gloss that in doing so, they breached their duties. This is an improper attempt to recast a breach of contract cause of action as a tort claim. Nor is there any social policy that would demand resort to tort remedies. Without any action sounding in tort, there is no basis for a finding of potential joint and several liability on the part of defendants, thereby precluding a claim for equitable indemnity.").

124. Still other courts appear to have dealt with the problem of multiple causal factors in breach of contract actions by apportioning damages between parties or factors contributing to the loss. *See S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 527 (3d Cir. 1978). Where no division of such damages is possible, a plaintiff recovers nothing. *See Lichter v. Mellon-Stuart Co.*, 305 F.2d 216, 220 (3d Cir. 1962) ("Since the court could find no basis for allocation of this lump sum between those causes which were actionable and those which were not, it was proper to reject the entire claim.").

125.	While a full analysis of these and other approaches makes for interesting academic reading,[7] the Court finds it sufficient to conclude for its purposes here that North Carolina law does not and would not support imposing joint and several liability on multiple parties for the mere breach of independent contracts, regardless of whether the result of those breaches is a single, indivisible injury.  The Court reaches this conclusion for several reasons.

126.	First, the approach of imposing joint and several liability AP Atlantic seems to advocate appears to be embraced by only a handful of states.  According to *Corbin on Contracts*,[8] the norm is quite different:

> In the law of torts, if the wrongful acts of others were also contributing factors, they and the defendant are sometimes regarded as "joint tortfeasors," each one is liable for the whole loss or harm.  In the contract field, however, if the acts of others who are not joint obligors (whether wrongful or not) are contributing factors, those others are not thereby joined with the defendant as having committed the breach of contract.

11 Arthur L. Corbin & Joseph M. Perillo, *Corbin on Contracts* § 55.9 (rev. ed. 2005). In the absence of any North Carolina precedent questioning the wisdom of this approach, the Court does not believe this State's Supreme Court, if confronted with the issue, would adopt the joint and several liability approach AP Atlantic promotes.

127.	Next, North Carolina law is ill-suited to cope with the fallout of imposing joint and several liability on multiple parties for breaching independent contracts.

---

[7] *See generally* Daniel J. Bussel, *Liability for Concurrent Breach of Contract*, 73 Wash. U. L. Q. 97 (1995).

[8] Courts of this State often find *Corbin* to be a persuasive source of authority.  *See Davidson & Jones, Inc. v. N.C. Dep't of Admin.*, 315 N.C. 144, 153, 337 S.E.2d 463, 468 (1985) (citing Corbin); *Fletcher v. Jones*, 314 N.C. 389, 395, 333 S.E.2d 731, 736 (1985) (same).

As previously discussed, our law does not allow for contribution or imply in law a right to indemnification between parties in the absence of a tortious injury. *See Tall House Bldg. Co.*, 165 N.C. App. at 883–84, 602 S.E.2d at 3–4; *Kaleel Builders, Inc.*, 161 N.C. App. at 41–43, 587 S.E.2d at 476–77. Consequently, our law would afford little recourse to one of several parties who, after being held jointly and severally liable for breach of contract, contends it has paid more than its fair share (excluding the unlikely possibility that the party had the foresight and ability to enter into contractual indemnity agreements with every other potential defendant to guard against the chance each would later breach their contracts and proximately cause a single harm to the promisee).

128. Finally, the policies underlying tort law—in which joint and several liability is more common—and contract law are different. The average plaintiff in a tort lawsuit does not choose his or her tortfeasors. Contracting parties, by comparison, have the ability to allocate risk among themselves at the outset of a transaction and are encouraged to do so. *See Lord*, 182 N.C. App. at 639, 643 S.E.2d at 30. As a result, considerations supporting the application of joint and several liability in the context of torts, such as "protect[ing] plaintiffs from defendants who are unable to pay judgments entered against them," *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 275 n.2 (1979) (Blackmun, J., dissenting), do not apply to parties whose remedies lie in contract. Were the Court to hold Madison or T.A. Kaiser jointly and severally liable with other parties for their alleged breaches of independent subcontracts here, the Court would essentially be importing a facet of tort law into a

case otherwise governed by the law of contract for AP Atlantic's benefit. To do so would undermine the principles supporting the economic loss rule. *See Lord*, 182 N.C. App. at 639, 643 S.E.2d at 30.

129. Thus, while the Court understands the logic behind AP Atlantic's desire to recover a lump sum and shift to its subcontractors the burden of dealing with the difficult causation issues that will inevitably arise at trial—a desire made all the more reasonable by the fact that AP Atlantic itself, as the general contractor, performed little-to-none of the allegedly problematic work at the Project—North Carolina law does not support the joint-and-several relief AP Atlantic requests. AP Atlantic's arguments advanced to avoid summary judgment on this point do not provide the Court with a basis for holding otherwise.

130. As Madison points out in its reply brief, *Skidmore* and similar cases relied upon by AP Atlantic deal with the particular issue of determining whether damages in a construction action were caused by flaws in an architect's designs or a contractor's deviation from suitable plans and specifications. *See Skidmore*, 103 N.C. App. at 679–80, 407 S.E.2d at 578–79 ("[I]n North Carolina, upon the owner's showing that the contractor materially deviated from the specifications, the burden of proof as to causation would shift to the contractor. If evidence showed his deviation did not cause any damage, the jury could find no liability as to the contractor."); *Burke Cty. Public Sch. Bd. of Educ. v. Juno Constr. Corp.*, 50 N.C. App. 238, 242, 273 S.E.2d 504, 507 (1981). These cases are factually inapposite and do not offer persuasive reasoning for applying joint and several liability to multiple subcontractors.

131. AP Atlantic's appeal to *Weaver Cooke* also fails to advance its position. In *Weaver Cooke*, the United States District Court for the Eastern District of North Carolina examined whether an indemnity agreement violated N.C.G.S. § 22B-1, which forbids indemnity agreements in the construction industry which seek to indemnify the promisee for its own negligence. *Weaver Cooke Constr., LLC*, 2016 U.S Dist. LEXIS 109490, at *8–9; *see* N.C.G.S. § 22B-1. As discussed further in connection with T.A. Kaiser's Motion below, the court held that the majority of the examined indemnity agreement was lawful because it promised only that the subcontractor would indemnify the general contractor for damages arising out of or caused by the subcontractor's own negligence. *Weaver Cooke Constr., LLC*, 2016 U.S Dist. LEXIS 109490, at *10–12. This holding in no way supports imposing joint and several liability upon subcontractors obligated under separate indemnity agreements.

132. Finally, AP Atlantic's assertion that its request for joint and several liability is not an appropriate issue for summary judgment because it is not an independent cause of action is unpersuasive. AP Atlantic provides no authority to support this position, and this argument runs contrary to the common practice by which courts of this State grant partial summary judgment to parties on certain issues that may not amount to an independent cause of action or defense but constitute a form of relief or doctrine which expands or further defines the scope of a party's liability under an asserted cause of action. *See, e.g., Stonewall Constr. Servs., LLC v. Frosty Parrott Burlington*, No. COA18-171, 2018 N.C. App. LEXIS 1077, at *4–5, *11 (N.C. Ct. App.

Nov. 6, 2018) (affirming trial court's granting of summary judgment on request to pierce the corporate veil);[9] *Atl. Contracting & Material Co. v. Adcock*, 161 N.C. App. 273, 281, 588 S.E.2d 36, 42 (2003) (affirming summary judgment on issue of punitive damages);[10] *Zarn, Inc. v. S. Ry. Co.*, 50 N.C. App. 372, 376, 274 S.E.2d 251, 255 (1981) (affirming trial court's granting of partial summary judgment "on the issue of special or consequential damages incurred by plaintiff"). To the extent AP Atlantic asks the Court to impose joint and several liability on its subcontractors for its breach of contract claims against each, the Court concludes Madison and T.A. Kaiser may move for summary judgment on that requested relief as much as they may move in their favor "as to all or any [other] part," N.C. R. Civ. P. 56(b), of AP Atlantic's breach of contract claims.

133. Accordingly, the Court concludes that no genuine issue of material fact exists as to whether Madison and T.A. Kaiser may be held jointly and severally liable to AP Atlantic for breach of contract. The Court will therefore grant Madison's and T.A. Kaiser's Motions on the issue of joint and several liability as detailed herein. Any liability found on AP Atlantic's separate breach of contract claims shall not be joint and several.

---

[9] "[P]iercing the corporate veil is an ancillary equitable remedy and not an independent cause of action." *W&W Partners, Inc. v. Ferrell Land Co.*, 2018 NCBC LEXIS 52, at *22 (N.C. Super. Ct. May 22, 2018); *see Green v. Freeman*, 367 N.C. 136, 146, 749 S.E.2d 262, 271 (2013) ("The doctrine of piercing the corporate veil is not a theory of liability.").

[10] A request for punitive damages is not an independent cause of action. *Oestreicher v. Am. Nat'l Stores, Inc.*, 290 N.C. 118, 134, 225 S.E.2d 797, 808 (1976).

D.    Madison's Motion

134. The Court turns now to the remaining issues raised by the parties' individual motions, beginning with Madison's Motion.  In addition to the matters already discussed, Madison moves the Court for summary judgment in its favor on (i) A&P's claim for breach of the contract between AP Atlantic and Madison, (ii) the consequential damages the AP Parties seek from Madison, and (iii) AP Atlantic's delay-based breach of contract claim.  The Court addresses each issue in order.

1.  A&P's Claim Against Madison for Breach of Madison Subcontract

135.  As part of its breach of contract claim against Madison, A&P alleges that, to "the extent A&P has any obligations to Plaintiff Crescent arising out of or relating to the framing, floor system, truss work, or other work furnished by Madison . . . Madison is responsible in full to A&P for all such liability[.]"  (A&P Third-Party Compl. 32–33.)  A&P further alleges that it is "entitled to full and complete indemnity by Madison for any damage, injury, loss, liability, [or] expense," including attorneys' fees and expert witness fees, "incurred by A&P as a direct or indirect result of Madison's work[.]"  (A&P Third-Party Compl. 33.)

136. Madison contends that this claim should be dismissed at summary judgment because A&P is not a party to the contract between AP Atlantic and Madison (the "Madison Subcontract") or a third-party beneficiary who may enforce the terms of that contract.  Madison additionally points out that A&P never pleaded a breach of contract claim as a third-party beneficiary and argues it should not be able to pursue its claim on that theory now.

137. A&P responds by asserting that it is, in fact, a third-party beneficiary of the Madison Subcontract, pointing to Section 15.1 of the agreement, which contains a promise by Madison to "indemnify . . . Contractor (including its affiliates, parents and subsidiaries)" for liabilities arising from Madison's work. (Madison Subcontract § 15.1.) A&P argues that it has stated a claim against Madison for breach of contract pursuant to this term.

138. After a review of A&P's pleadings, the Court disagrees. Even if A&P could maintain a breach of contract claim against Madison as a third-party beneficiary, A&P has not pleaded such a claim in this case.

139. To have standing to assert a claim for breach of contract in North Carolina, a claimant must either be a party to the contract in question or a beneficiary for whose benefit the contract was executed, i.e., an intended beneficiary. *Wirth v. Sunpath, LLC*, 2017 NCBC LEXIS 84, at *16 (N.C. Super. Ct. Sept. 14, 2017); *see Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 329 N.C. 646, 651, 407 S.E.2d 178, 181 (1991). A party seeking "[t]o establish a claim based on the third party beneficiary contract doctrine" must allege: "(1) the existence of a contract between two other persons; (2) that the contract was valid and enforceable; and (3) that the contract was entered into for [the claimant's] direct, and not incidental, benefit." *United Leasing Corp. v. Miller*, 45 N.C. App. 400, 405–06, 263 S.E.2d 313, 317 (1980).

140. A&P's third-party claim for breach of contract against Madison was asserted "in the event it [was] determined that A&P [was] the contractor for the Project," (A&P Third-Party Compl. 28), and alleged "[i]f A&P [was] the contractor for the Project as

alleged by [Crescent] . . . , which is denied, A&P would have entered into a subcontract agreement with Madison . . . pursuant to which Madison" would have provided the materials, equipment, labor, and tools needed for the framing work it performed, (A&P Third-Party Compl. 29). When Crescent later amended its Complaint against A&P to include only a single claim under the Performance Guaranty, (Crescent's Am. Compl. ¶¶ 51–59), A&P filed an amended pleading consisting of an answer, affirmative defenses, a counterclaim, and a third-party complaint. (Adolfson & Peterson Constr., Inc.'s Answer, Affirmative Defenses, Countercl. and Third Party Compl. Resp. Crescent Univ. City Venture, LLC's Am. Compl. 1 [hereinafter "A&P Am. Third-Party Compl."], ECF No. 160.) In this pleading, A&P incorporated its previous third-party claims against Madison by reference, without any alterations or amendments. (A&P Am. Third-Party Compl. 2.)

141. Examining these pleadings, the Court concludes that A&P has not asserted a claim based upon the third-party beneficiary contract doctrine. *See United Leasing Corp.*, 45 N.C. App. at 405–06, 263 S.E.2d at 317. Instead, A&P's alternative breach of contract claim against Madison continues to be premised upon the existence of a contract between A&P and Madison. Despite earlier confusion in this case as to whether AP Atlantic or A&P served as the general contractor on the Project, at summary judgment it is uncontroverted that AP Atlantic was the general contractor, that AP Atlantic and Madison were the parties to the Madison Subcontract, and that A&P was not a party to the Madison Subcontract. (*See, e.g.*, Madison Subcontract 1

(listing "AP Atlantic d.b.a. Adolfson & Peterson Construction" as the "Contractor").) The record at summary judgment thus establishes that an essential element of A&P's claim—the existence of a valid contract between A&P and Madison—does not exist. The Court therefore concludes that no genuine issue of material fact exists as to A&P's claim for breach of contract against Madison and will grant Madison's Motion to the extent it requests summary judgment on that claim.

### 2. Consequential Damages

142. Madison next moves the Court for summary judgment on the issue of consequential damages, arguing that the AP Parties, as part of their third-party claims, may not recover from Madison for the consequential damages Crescent seeks. Specifically, Madison requests a determination that it will not be liable for Crescent's hotel, shuttle and storage, relocation stipend and gift card, resident-related attorneys' fees, and operational and staffing expenses. Having granted Madison summary judgment on A&P's claims against it, the Court considers this issue only as it relates to AP Atlantic's breach of contract claim against Madison

143. Madison argues that consequential damages are those that would fall within the contemplation of the parties to a contract and which were foreseeable at the time the parties entered the contract. Because the General Contract here waived Crescent's ability to recover consequential damages from AP Atlantic, Madison argues Crescent's hotel, shuttle and storage, relocation stipend and gift card, resident-related attorneys' fees, and operational and staffing expenses, even if

resulting from a breach of the Madison Subcontract, were not foreseeable at the time the Madison Subcontract was executed and are thus unrecoverable.

144. In response to Madison's argument, AP Atlantic notes that a resolution of Crescent's rights concerning consequential damages may resolve any need to determine AP Atlantic's right to recover such damages from Madison. As to the damages already held unrecoverable, this insight is correct.

145. The Court has already concluded that Crescent may not recover consequential damages from AP Atlantic and is particularly barred from recovering its hotel, shuttle and storage, relocation stipend and gift card, or resident-related attorneys' fees expenses. Thus, because AP Atlantic's claims remaining against Madison are merely "derivative third-party claims," (Consent Mot. Realign Parties 4), the question of whether Madison must indemnify AP Atlantic for any portion of these damages is moot, *see In re Hamilton*, 220 N.C. App. 350, 353, 725 S.E.2d 393, 396 (2012) (noting that an issue is moot whenever "the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue" (quoting *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978))). Madison's Motion is therefore denied as moot to the extent it seeks a determination as to these alleged damages.

146. However, the Court has further concluded that it cannot enter summary judgment as to whether Crescent's claimed $650,382.28 in "Payroll/Contracted Staffing/Operational" expenses are unrecoverable consequential damages. Indeed, in the event AP Atlantic is found liable to Crescent for breach of contract, Crescent may

be entitled to recover these expenses if they are determined, in whole or in part, to constitute incidental damages. *See Pleasant Valley Promenade*, 120 N.C. App. at 665, 464 S.E.2d at 59. The Court therefore concludes that Madison has failed to show that no genuine issue of material fact remains as to whether AP Atlantic may recover from Madison any amount AP Atlantic is required to pay for these expenses. Accordingly, to the extent Madison's Motion seeks a determination that AP Atlantic may not recover from Madison for Crescent's alleged "Payroll/Contracted Staffing/Operational" damages, the motion is denied.

### 3. Delay-Related Claim and Settlement Agreement

147. Madison finally moves for summary judgment on a delay-based breach of contract claim brought against it by AP Atlantic. This claim was asserted by AP Atlantic in its April 29, 2016 Third-Party Complaint and alleged that Madison was liable to AP Atlantic for any liability AP Atlantic suffered as a result of Crescent's construction delay claims. (Pl.'s Am. Reply and Affirmative Defenses Crescent Univ. City Venture, LLC's Countercl. And Third-Party Compl. 7.)

148. Madison asserts that on December 31, 2017, the AP Parties and Madison signed a settlement agreement containing a release by the AP Parties of any and all claims against Madison arising out of construction delays (the "Madison Delay Settlement"). (Def. Madison Constr. Grp., Inc.'s Br. Supp. Mot. Summ. J. Ex. N, at 5, ECF No. 320.) The Madison Delay Settlement required the approval of the United States Bankruptcy Court for the Western District of North Carolina, and on February

2, 2018, the Honorable J. Craig Whitley entered an order approving the agreement. (Def. Madison Constr. Grp., Inc.'s Br. Supp. Mot. Summ. J. Ex. O, at 1, ECF No. 321.)

149. "A completed compromise and settlement fairly made between persons legally competent to contract and having the authority to do so . . . , and supported by sufficient consideration, operates as a merger of, and bars all right to recover on, the claim or right of action included therein[.]" *Jenkins v. Fields*, 240 N.C. 776, 778, 83 S.E.2d 908, 910 (1954).

150. The AP Parties do not dispute entering into the Madison Delay Settlement or contend that Madison has mischaracterized the effect of the agreement. In fact, at the May 30, 2018 hearing on the Motions for Summary Judgment, counsel for AP Atlantic stated that a voluntary dismissal of its delay-based claim against Madison was imminent. To date, however, the Court has not received a notice of voluntary dismissal concerning this claim.

151. In light of the presented Madison Delay Settlement, the other evidence of record, and the representations of AP Atlantic's counsel at the May 30, 2018 hearing, the Court concludes that no genuine issue of fact remains as to AP Atlantic's delay claim against Madison and that AP Atlantic has released Madison from delay-based claims arising out of Madison's work on the Project. The Court therefore concludes that Madison is entitled to summary judgment on AP Atlantic's delay-based breach of contract claim as a matter of law. *See id.*[11]

---

[11] Madison's Motion focused upon the Madison Delay Settlement as a basis for dismissing AP Atlantic's delay-based breach of contract claim, and the Court enters summary judgment in Madison's favor on those grounds. The Court also notes, however, that Crescent's dismissal of all delay-based claims against the AP Parties would serve as an additional

E.    T.A. Kaiser's Motion

152.  T.A. Kaiser moves for summary judgment in its favor on AP Atlantic's demand for contractual indemnity contained in AP Atlantic's breach of contract claim.  In particular, T.A. Kaiser contends that the indemnification clause in its subcontract with AP Atlantic is overbroad and void under North Carolina law.  T.A. Kaiser further argues that in the event it is found liable to AP Atlantic, the undisputed facts show that AP Atlantic was contributorily negligent and that contributory negligence should bar AP Atlantic's demand for indemnity.  Finally, T.A. Kaiser seeks summary judgment on AP Atlantic's request that it be reimbursed for attorneys' fees under the terms of its subcontract with T.A. Kaiser (the "T.A. Kaiser Subcontract").  The Court addresses each argument in turn.[12]

---

reason for dismissing AP Atlantic's "derivative third-party claims," (Consent Mot. Realign Parties 4), based upon delay-related damages.  *See Spearman v. Pender Cty. Bd. of Educ.*, 175 N.C. App. 410, 413, 623 S.E.2d 331, 333 (2006) (holding dismissal of underlying claims against defendant mooted third-party claims against third-party defendants).

[12]  T.A. Kaiser also argues that AP Atlantic's breach of contract claim, as pleaded, appears to request damages which extend beyond the possible results of T.A. Kaiser's work and the wording of the indemnity provision in the T.A. Kaiser Subcontract.  To the extent T.A. Kaiser's argument on this point is based upon AP Atlantic's request for joint and several liability between T.A. Kaiser and other parties, the Court has already granted T.A. Kaiser the relief it seeks in this Order and Opinion.  To the extent T.A. Kaiser's argument is grounded upon the reference to "Madison" found in the claim pleaded against T.A. Kaiser, AP Atlantic has confirmed that reference was a typographical error and it appears the parties do not have a dispute.  Finally, to the extent T.A. Kaiser points to paragraph 173's use of the word "or" to argue AP Atlantic is trying to recover the entirety of its liability to Crescent, regardless of T.A. Kaiser's involvement, AP Atlantic, in its response brief, confirms that it is seeking to recover from T.A. Kaiser damages "arising out of or resulting from the performance of Subcontractor's Work" and points to another paragraph in the same claim, which states that AP Atlantic is seeking recovery from T.A. Kaiser for liability arising out of "the installation of the HVAC system, installation of ductwork, and/or the cutting and/or damage of trusses and/or framing members by" T.A. Kaiser.  (AP Opp'n T.A. Kaiser Mot. Summ. J. 6 (quoting Am. Compl. 171).)  While it is uncertain how this representation squares with AP Atlantic's attempt to hold T.A. Kaiser jointly and severally liable, the Court concludes, on the

1. <u>Validity of Indemnification Clause Under N.C.G.S. § 22B-1</u>

153. First, T.A. Kaiser argues that the indemnification provision in the T.A. Kaiser Subcontract is void under N.C.G.S. § 22B-1, which provides as follows:

> Any promise or agreement in, or in connection with, a contract or agreement relative to the design, planning, construction, alteration, repair or maintenance of a building, structure, highway, road, appurtenance or appliance, including moving, demolition and excavating connected therewith, purporting to indemnify or hold harmless the promisee, the promisee's independent contractors, agents, employees, or indemnitees against liability for damages arising out of bodily injury to persons or damage to property proximately caused by or resulting from the negligence, in whole or in part, of the promisee, its independent contractors, agents, employees, or indemnitees, is against public policy and is void and unenforceable. Nothing contained in this section shall prevent or prohibit a contract, promise or agreement whereby a promisor shall indemnify or hold harmless any promisee or the promisee's independent contractors, agents, employees or indemnitees against liability for damages resulting from the sole negligence of the promisor, its agents or employees.

N.C.G.S. § 22B-1.

154. The T.A. Kaiser Subcontract, in turn, contains the following term in Section 15.1:

> To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless Owner, the Architect, Contractor (including its affiliates, parents, and subsidiaries) and other contractors and subcontractors and all their agents and employees from and against all claims, damages, loss and expenses, including but not limited to attorney's fees and disbursements paid or incurred by Contractor as a part of the loss or damage or to enforce the provisions of this paragraph, arising out of or resulting from the performance of Subcontractor's Work including, but not limited to: (a) any such claim, damage, loss, or expense is attributable to bodily injury, sickness, diseases, or death, or to injury to or destruction of tangible property (other than Subcontractor's Work itself) including the loss of use resulting therefrom, to

---

basis of AP Atlantic's representation and the Court's other holdings herein, that this issue is moot. The Court will thus deny T.A. Kaiser's Motion on these further points as moot, without prejudice to T.A. Kaiser's ability to assert arguments concerning the scope of AP Atlantic's sought relief should T.A. Kaiser later deem in good faith that such arguments are appropriate.

the extent caused in whole or in any part by any negligent act or omission of Subcontractor or anyone directly or indirectly employed by Subcontractor or anyone for whose acts Subcontractor may be liable[.]

(T.A. Kaiser Subcontract § 15.1.)

155. T.A. Kaiser contends that the final clause of Section 15.1—beginning with the phrase, "to the extent caused in whole or in any part by any negligent act or omission of [T.A. Kaiser]—violates N.C.G.S. § 22B-1 because the "in any part" language of this section requires T.A. Kaiser to indemnify AP Atlantic if AP Atlantic is found partially negligent alongside T.A. Kaiser. The Court disagrees.

156. On more than one occasion, courts have found language nearly identical to that used in the T.A. Kaiser Subcontract to be in compliance with N.C.G.S. § 22B-1.

157. For example, in *International Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 285 S.E.2d 553 (1989), the North Carolina Court of Appeals reviewed the contract term reproduced below:

> The Builder shall indemnify and hold harmless the Owner and his agents and employees from and against all claims, losses, and expenses, including attorney's fees arising out of or resulting from the performance of the work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused *in whole or in part* by any negligent act or omission of the Builder, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder.

*Id.* at 315, 385 S.E.2d at 555 (emphasis added). The court held only the very last clause of this provision violated N.C.G.S. § 22B-1 and severed it from the remainder of the paragraph. *Id.* at 315–16, 385 S.E.2d at 555. "The general meaning of the

provision—that [the Builder would] indemnify [the Owner] for injury or damage resulting from the negligent acts of [the Builder], its subcontractors, and their employees—[was] not affected" by this severance, and the court held the remainder of the provision valid under North Carolina law. *Id.*

158. More recently, in *Weaver Cooke*, the United States District Court for the Eastern District of North Carolina reviewed a bankruptcy court decision striking certain portions of the following indemnification clause (represented by the words struck through below):

> To the fullest extent permitted by law, Subcontractor shall indemnify and hold harmless Contractor, its agents and employees from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from Subcontractor's performance of Subcontractor's Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than Subcontractor's Work itself) including loss of use resulting therefrom, *if caused in whole ~~or in part~~ by the negligent acts or omissions of Subcontractor*, a sub-subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable~~, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder~~[.]

*Weaver Cooke Constr., LLC*, 2016 U.S. Dist. LEXIS 109490, at *9–10. The bankruptcy court struck these clauses from the indemnification provision on the same grounds T.A. Kaiser endorses here. *Id.* at *9 ("[T]he bankruptcy court concluded that two portions of ¶ 16.2 . . . violate § 22B-1 because those portions 'purport[ ] to hold [Subcontractor] . . . liable to [Contractor] for [Contractor's] own negligence[.]' "). The bankruptcy court then granted summary judgment in favor of the subcontractor because the claimant could not establish that the subcontractor was "wholly responsible" for the damages sought. *Id.* at *10.

159. On appeal, the district court disagreed that the first set of words struck—"or in part"—violated N.C.G.S. § 22B-1. *Id.* at *11. "The statute," the court noted, "does not preclude indemnification where one is being held responsible solely for one's own negligence even though other parties might have been negligent too." *Id.* When the whole of the paragraph was read, the court reasoned, it was clear the subcontractor had agreed to indemnify the general contractor "only for damages arising out of [the subcontractor's] performance of its work and caused by [the subcontractor's] (or its [agents']) negligence." *Id.* The district court concluded that the provision did "not purport to hold [the subcontractor] responsible for the negligence of any other party" and that the provision was valid under N.C.G.S. § 22B-1. *Id.* at *11–12. The court finally noted that the provision did "not bar indemnification if other parties were negligent." *Id.* at *12.

160. On the basis of these decisions, and after reviewing the plain language of the T.A. Kaiser Subcontract, the Court reaches a similar conclusion in this case. The T.A. Kaiser Subcontract requires T.A. Kaiser to indemnify AP Atlantic for losses "arising out of or resulting from the performance of *[T.A. Kaiser's] Work* including, but not limited to . . . injury to or destruction of tangible property . . . including the loss of use resulting therefrom, *to the extent caused* in whole or in any part *by any negligent act or omission of [T.A. Kaiser]*." (T.A. Kaiser Subcontract § 15.1 (emphasis added).) Based upon the interpretations of similar language in *Weaver Cooke* and *International Paper*, the Court concludes that T.A. Kaiser, by this provision, agreed to indemnify AP Atlantic only for damages arising out of T.A. Kaiser's performance

of its work. As such, the provision does not hold T.A. Kaiser responsible for the negligence of another party, and the fact that other parties may also be found to have been negligent will not relieve T.A. Kaiser of liability for its own negligence. *See Weaver Cooke Constr., LLC*, 2016 U.S. Dist. LEXIS 109490, at \*11–12.

161. Accordingly, the Court concludes that the challenged portion of Section 15.1 of the T.A. Kaiser Subcontract is valid under N.C.G.S. § 22B-1. Thus, to the extent T.A. Kaiser's Motion requests that the Court void any portion of Section 15.1, the motion is denied.

## 2. AP Atlantic's Contributory Negligence

162. T.A. Kaiser also argues at summary judgment that even if AP Atlantic is otherwise able to seek indemnification from T.A. Kaiser, such indemnification will be barred under N.C.G.S. § 22B-1 as a matter of law because AP Atlantic was contributorily negligent.

163. Specifically, T.A. Kaiser contends that if it is found to have conducted its work on the Project in a negligent manner and is thus found obligated under the indemnity provision of the T.A. Kaiser Subcontract, AP Atlantic will necessarily have also been negligent as a matter of law. T.A. Kaiser argues that deposition testimony from AP Atlantic's employees reveals that AP Atlantic told T.A. Kaiser not to damage truss MCPs during the HVAC installation process and that AP Atlantic was clearly aware that T.A. Kaiser had hammered or bent MCPs during installation. Despite this, T.A. Kaiser argues, AP Atlantic did not contact Trussway or instigate a process to repair every bent MCP it discovered. T.A. Kaiser contends that this failure by AP

Atlantic to repair any damage T.A. Kaiser caused during the HVAC installation constitutes contributory negligence as a matter of law and that N.C.G.S. § 22B-1 does not permit a contributorily negligent contractor to recover contractual indemnification from a subcontractor. The Court disagrees.

164. Assuming without deciding that T.A. Kaiser is correct in its argument concerning the availability of and the effect of a finding of contributory negligence against AP Atlantic in this case, summary judgment on that issue would not be appropriate on this record. "Contributory negligence is a jury question unless the evidence is so clear that no other conclusion is possible." *Cooper v. Town of Southern Pines*, 58 N.C. App. 170, 174, 293 S.E.2d 235, 237 (1982). While T.A. Kaiser may contend that any finding in this case that its own work was faulty necessarily demonstrates negligence on the part of AP Atlantic, the record does not show such negligence by AP Atlantic as a matter of law.

165. In particular, the Court concludes reasonable minds could disagree that AP Atlantic's failure to repair any problematic work by T.A. Kaiser amounts to contributory negligence, given that such failure would have occurred after T.A. Kaiser had allegedly caused the damage to MCPs. Deposition testimony also conflicts on whether AP Atlantic directed T.A. Kaiser to bend MCPs in the course of its work or ordered T.A. Kaiser not to do so. (Kaiser Br. Supp. Summ. J. Ex. 4, at 27:13–17, ECF No. 355.4, Ex. 5, at 477:12–24, ECF No. 355.5.) This evidence does not show contributory negligence on the part of AP Atlantic such that no other conclusion is possible. Accordingly, even assuming that AP Atlantic's contributory negligence

would bar AP Atlantic's demand for indemnity from T.A. Kaiser, the Court concludes a genuine issue of material fact would exist as to whether AP Atlantic was contributorily negligent in this case. The Court will therefore deny T.A. Kaiser's Motion to the extent it requests a dismissal of AP Atlantic's breach of contract claim or the demand for indemnity contained therein on these grounds.

166. T.A. Kaiser also requests, in the event the Court does not hold AP Atlantic's indemnity demand barred as a matter of law, that the Court enter an order stating that AP Atlantic will be barred from pursuing indemnification from T.A. Kaiser should the Court or the jury later determine AP Atlantic was contributorily negligent. The Court concludes that it would be premature to grant this relief at this point in the proceedings. The Court therefore denies T.A. Kaiser's Motion to the extent it requests such an order, without prejudice to T.A. Kaiser's ability to assert this argument again at trial or in later motions practice.

3. AP Atlantic's Request for Attorneys' Fees

167. T.A. Kaiser's Motion finally requests the entry of a summary judgment order preventing AP Atlantic from recovering attorneys' fees from T.A. Kaiser as requested in AP Atlantic's Amended Complaint. (*See* Am. Compl. ¶ 176.) T.A. Kaiser argues that attorneys' fees may only be recovered in North Carolina when such relief is expressly authorized by statute and insists that AP Atlantic has no such statutory basis for its request. Specifically, while acknowledging that the indemnity provision in Section 15.1 of the T.A. Kaiser Subcontract's expressly mentions attorneys' fees, T.A. Kaiser contends that provision imposes an obligation only on T.A. Kaiser and

thus cannot be considered a reciprocal attorneys' fees provision in a business contract under N.C.G.S. § 6-21.6.

168. In response, AP Atlantic argues that T.A. Kaiser mistakes the nature of its requested relief. AP Atlantic contends that it is not seeking attorneys' fees incurred in this litigation against T.A. Kaiser, and thus is not attempting to shift the cost of this proceeding onto T.A. Kaiser as it might if the two had a reciprocal fees agreement complying with N.C.G.S. § 6-21.6. Instead, AP Atlantic explains that it is seeking to recover attorneys' fees incurred in defending itself against Crescent. AP Atlantic argues that T.A. Kaiser is responsible for these expenses as part of its agreement to defend, indemnify, and hold harmless AP Atlantic for expenses or losses arising out of T.A. Kaiser's work, as set forth in Section 15.1 of the T.A. Kaiser Subcontract. AP Atlantic notes that Sears and Madison are both providing for its defense under similar indemnification provisions and represents that such provisions are "standard in . . . construction" contracts and are routinely enforced in North Carolina "in the insurance and construction industries." (AP Opp'n T.A. Kaiser Mot. Summ. J. 9.) AP Atlantic cites no law in support of this proposition, however, and the state of the law in North Carolina is less than clear.

169. AP Atlantic's attempt to recover attorneys' fees spent defending against Crescent's claim presents questions concerning the recoverability of "ancillary fees" under North Carolina law. This Court previously examined the circumstances under which North Carolina law allows for the recovery of such fees in *GR&S Atlantic Beach, LLC v. Hull*, 2011 NCBC LEXIS 38 (N.C. Super. Ct. Sept. 29, 2011) (Gale, J.).

170. In *GR&S*, Judge Gale distinguished between ancillary fees—"fees associated with administrative procedures or claims presented by third-parties"—and direct fees—"fees associated with litigation between the [p]arties[.]" *Id.* at *1. The facts of the case were straightforward: a contractual indemnification provision between the parties expressly allowed for the recovery of attorneys' fees; the plaintiffs, as a result of certain matters related to the contract containing the indemnification provision, incurred ancillary fees; and thereafter, in the lawsuit before the Court, the plaintiffs sought recovery of their ancillary fees under the indemnification provision. *Id.* at *1–9. As explained by the Court, however, the law concerning the recovery of ancillary fees was uncertain.

171. Judge Gale began by noting that North Carolina law clearly requires statutory authorization for a party to recover direct fees, citing *Stillwell Enterprises, Inc. v. Interstate Equipment Co.*, 300 N.C. 286, 289, 266 S.E.2d 812, 814–15 (1980). *GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *2. The Court observed that *Stillwell* did not directly address the issue of ancillary fees but did refer to "the general rule . . . that a successful litigant may not recover attorneys' fees, whether as costs or as an item of *damages*, unless such a recovery is expressly authorized by statute," *id.* at *11 (emphasis added) (quoting *Stillwell Enters., Inc.*, 300 N.C. at 289, 266 S.E.2d at 814), and that "damages" may be "used to refer to Ancillary Fees," *id.*

172. Still, the Court hesitated to read *Stillwell* to include ancillary fees due to another line of North Carolina cases beginning with *Queen City Coach Co. v. Lumberton Coach Co.*, 229 N.C. 534, 50 S.E.2d 288 (1948), in which the Supreme

Court of North Carolina refused to allow for the recovery of ancillary fees under an indemnity agreement because the agreement did not expressly mention attorneys' fees. *GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *12–13; *see Queen City Coach Co.*, 229 N.C. at 536, 50 S.E.2d at 289 ("In the absence of an express agreement therefor [the term 'loss'] would not include amounts paid for attorneys' fees."). The Court noted that *Queen City Coach*'s reasoning was not based on any absence of statutory authority and that there did not appear to be any opinion from our Supreme Court comparing the rulings of *Queen City Coach* and *Stillwell* or addressing whether the general rule requiring statutory authority to recover direct fees extended to the recovery of ancillary fees when a contract clearly provided for such recovery. *GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *12–13.

173. The Court's investigation into federal decisions interpreting North Carolina's law did not resolve the issue and revealed two decisions denying requests for ancillary fees, one relying on *Stillwell* and the other relying on *Queen City Coach*. *Id.* at *13–18; *see Norfolk S. Ry. Co. v. Timec Co.*, No. 1:08CV99, 2009 U.S. Dist. LEXIS 105362, at *13, *16–18 (M.D.N.C. Nov. 9, 2009) (stating *Stillwell* did not "speak to the enforcement of a provision said to allow the recovery of attorney's fees in an indemnity agreement" before concluding, under *Queen City Coach*, that an indemnity agreement that failed to mention attorneys' fees did not allow for the recovery of ancillary fees); *Sara Lee Corp. v. Quality Mfg., Inc.*, 201 F. Supp. 2d 608, 614 (M.D.N.C. 2002) (rejecting the argument that North Carolina law authorizes ancillary fees if there is an express contract provision without statutory authority,

citing *Stillwell*, and stating "the weight of the case law clearly supports [the] position that statutory authority is absolutely required to recover attorney's fees").

174. Ultimately, the Court opined that the public policy concerns behind requiring statutory authorization for the recovery of direct fees were not necessarily applicable to indemnity agreements allowing for the recovery of ancillary fees, and thus, although it declined to enter a final ruling on the issue at the motion to dismiss stage, the Court indicated that it was inclined to allow the plaintiffs to recover ancillary fees without a statutory basis, should that issue later require resolution. *GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at \*19, \*22–23. The Court went on to hold, however, that the indemnity agreement in question was also an "evidence of indebtedness" under N.C.G.S. § 6-21.2, *id.* at \*28, which would have allowed the plaintiffs to recover attorneys' fees subject to a statutory cap, *see* N.C.G.S. § 6-21.2. Later, at summary judgment, the Court reaffirmed its conclusion that the agreement allowed for the recovery of attorneys' fees under N.C.G.S. § 6-21.2 and again elected to reserve is final ruling on whether the plaintiffs could recover ancillary fees without statutory authorization, noting that subsequent developments in North Carolina law still did not squarely resolve the question. *GR&S Atl. Beach, LLC v. Hull*, 2012 NCBC LEXIS 54, at \*37–40 (N.C. Super. Ct. Oct. 10, 2012).

175. The Court is aware of no change in North Carolina law affecting the availability of ancillary fees under an indemnity agreement since Judge Gale analyzed the issue in *GR&S*. The state of the law on this topic thus remains uncertain.

176. Adding to matters here, the T.A. Kaiser Subcontract also contains language to the effect that T.A. Kaiser has agreed to "defend" AP Atlantic against claims resulting from T.A. Kaiser's work. (T.A. Kaiser Subcontract § 15.1.) The extent to which this changes the availability of ancillary fees in this case is not clear. While AP Atlantic represents that North Carolina law enforces duty-to-defend clauses in the insurance and construction industries, the Court's own research supports only the portion of this assertion relating to insurance.

177. In *Lowe v. Fidelity & Casualty Co.*, 170 N.C. 445, 87 S.E. 250 (1915), our Supreme Court held that a plaintiff could recover ancillary fees when a defendant breached a contractual duty to defend the plaintiff in a previous lawsuit. *Id.* at 447, 87 S.E. at 252; *see also Queen City Coach Co.*, 229 N.C. at 536, 50 S.E.2d at 289 (distinguishing *Lowe* as a case where ancillary fees could be awarded due to a breach of a contractual duty to defend, as opposed to an attempt to recover attorneys' fees under an indemnity agreement). Subsequent appellate case law, however, hints that this availability of ancillary fees may be specifically limited to circumstance in which an insurance company has wrongfully refused to defend an insured against a lawsuit—the situation in *Lowe*. *See Lowe*, 170 N.C. at 447, 87 S.E. at 252; *see also Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 277 N.C. 216, 219, 176 S.E.2d 751, 754 (1970) ("It is well settled that an insurer who wrongfully refuses to defend a suit against its insured is liable to the insured for sums expended in payment or settlement of the claim, for reasonable attorneys' fees, for other expenses of defending the suit, for court costs, and for other expenses incurred because of the refusal of the

insurer to defend."); *Standard Accident Ins. Co. v. Harrison-Wright Co.*, 207 N.C. 661, 673, 178 S.E. 235, 242 (1935) ("In 7 Couch Cyc. of Insurance Law, sec. 1875 (e), at page 6255, it is said: 'If the insurer refuses to defend a suit against the insured under the policy stipulations and insured is compelled to undertake the defense and does so, insurer is liable for the amount of the judgment and expenses incurred in conducting said defense.' "); *Collins & Aikman Prods. Co. v. Hartford Accident & Indem. Co.*, 125 N.C. App. 412, 414, 481 S.E.2d 96, 97 (1997) ("*Jamestown* is consistent with the general rule that the victorious party's attorney's fees are not recoverable except in instances (1) where the breached insurance contract was one for legal services or, in other words, a contract creating a duty to defend, (2) where the insurer acted in bad faith in denying coverage, or (3) where otherwise authorized by contract or statute."). This is likely why Judge Gale resolved not to base his decisions in *GR&S* on the breach of a duty to defend, despite the plaintiffs' arguments on that topic. *See GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *19–21 n.8 ("The Court is reluctant to premise its decision in this case on insurer duty to defend cases which involve the interplay between insurance contracts and a series of statutory provisions that control them.").

178. The Court has included this discussion to explain its reasoning and to alert the parties to an issue that will likely require an increased level of attention at a further point in these proceedings. For the time being, the Court concludes that it may reserve ruling on the issue of whether AP Atlantic can recover ancillary fees in full from T.A. Kaiser because the record at summary judgment shows that AP

Atlantic is entitled to recover at least a portion of its ancillary fees under a statutory basis.

179. Under N.G.C.S. § 6-21.2, "[o]bligations to pay attorneys' fees upon any . . . evidence of indebtedness . . . shall be valid and enforceable . . . if such . . . evidence of indebtedness be collected by or through an attorney at law after maturity[.]" N.C.G.S. § 6-21.2. "[A]n evidence of indebtedness . . . is a *writing* which acknowledges a debt or obligation and which is executed by the party obligated thereby." *Stillwell Enters., Inc.*, 300 N.C. at 294, 266 S.E.2d at 817 (quoting *State Wholesale Supply, Inc. v. Allen*, 30 N.C. App. 272, 277, 227 S.E.2d 120, 124 (1976)). As used in N.C.G.S. § 6-21.2, "evidence of indebtedness" means "any printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money." *Id.* Contracts between parties may constitute an evidence of indebtedness under section 6-21.2, *GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *26–27 (citing cases), including construction contracts, *see United States ex rel. SCCB, Inc. v. P. Browne & Assocs., Inc.*, 751 F. Supp. 2d 813, 817 (M.D.N.C. 2010) (holding a construction subcontract was an evidence of indebtedness under section 6-21.2); *Lawrence v. Wetherington*, 108 N.C. App. 543, 549, 423 S.E.2d 829, 832–33 (1993) (allowing an award of attorneys' fees under section 6-21.2 under a contract for installation of vinyl siding), and indemnity agreements, *see GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *26–28. Further, a contract may qualify as an "evidence of indebtedness" even if an "obligation to pay money" arises only upon breach of the contract. *See Southland Amusements &*

*Vending, Inc. v. Rourk*, 143 N.C. App. 88, 95, 545 S.E.2d 254, 258 (2001) (holding agreement which stated "[i]f [defendant] breaches any provision of this Agreement, then [plaintiff] shall be entitled to recover as damages all of the profits which it would have otherwise earned during the term remaining as of the date of such breach" evidenced a legally enforceable obligation to pay money and constituted an evidence of indebtedness under section 6-21.2).

180. In this case, the T.A. Kaiser Subcontract provided that T.A. Kaiser would "indemnify . . . [AP Atlantic] (including its affiliates, parents, and subsidiaries) . . . from and against all claims, damages, loss and expenses, including . . . attorney's fees . . . incurred by [AP Atlantic] as a part of the loss or damage . . . arising out of or resulting from the performance of [T.A. Kaiser's] Work[.]" (T.A. Kaiser Subcontract § 15.1.) The Court has already rejected T.A. Kaiser's challenges to the validity of this provision. The Court therefore concludes, on the undisputed facts of record at summary judgment, that the T.A. Kaiser Subcontract contains a legally enforceable obligation to pay money, is signed by T.A. Kaiser, (T.A. Kaiser Subcontract 16), and is thus an evidence of indebtedness under N.C.G.S. § 6-21.2, *see N.Y. Marine & Gen. Ins. Co. v. Beck Elec. Co.*, No. 3:05 CV 373-H, 2007 U.S. Dist. LEXIS 3499, at *28–29 (W.D.N.C. Jan. 16, 2007) (holding that an indemnity agreement executed by the obligor is a "legally enforceable obligation to pay money" and thus an "evidence of indebtedness" allowing recovery of attorneys' fees under N.C.G.S. § 6-21.2); *Southland Amusements & Vending, Inc.*, 143 N.C. App. at 95, 545 S.E.2d at 258; *GR&S Atl. Beach, LLC*, 2011 NCBC LEXIS 38, at *26–28.

181. Because the T.A. Kaiser Subcontract is an "evidence of indebtedness" under N.C.G.S. § 6-21.2, the Court concludes that it need not determine now whether the T.A. Kaiser Subcontract allows AP Atlantic to seek a full reimbursement of its ancillary fees incurred in defending against Crescent. The Court defers any ruling on that issue until a later date. *See GR&S Atl. Beach, LLC*, 2012 NCBC LEXIS 54, at *40 (electing to reserve final ruling on the issue of ancillary fees). Accordingly, the Court denies T.A. Kaiser's Motion to the extent it seeks an order declaring that AP Atlantic may not recover attorneys' fees from T.A. Kaiser.[13]

F.    Trussway's Motion

182. In addition to the previously discussed tort-based claims, Trussway's Motion requests summary judgment on Madison's crossclaims for breach of contract, indemnification, and breach of implied warranty. The Court addresses each claim in order.

1.    Madison's Breach of Contract Claim

183. Trussway contends that Madison's breach of contract claim should be dismissed at summary judgment because, following discovery, Madison cannot forecast evidence tending to show Trussway breached the terms of its purchase order

---

[13] T.A. Kaiser also moved for summary judgment on AP Atlantic's request to be indemnified for expert witness fees and other costs of litigation. In briefing and at oral argument, however, T.A. Kaiser argued for and requested summary judgment only on the issue of attorneys' fees. T.A. Kaiser did not provide a legal or factual argument concerning the impropriety of AP Atlantic's request for expert witness fees and other costs. The Court concludes that T.A. Kaiser has failed to meet its burden to show that no genuine dispute of material fact exists at summary judgment with respect to AP Atlantic's entitlement to these costs and expenses and therefore denies T.A. Kaiser's Motion as it relates to AP Atlantic's request for expert witness fees and other costs.

with Madison (the "Purchase Order"). Specifically, Trussway argues that the record is devoid of any evidence implicating Trussway as the source of the Project's truss defects. In support of this assertion, Trussway points to testimony from fact and expert witnesses that it asserts conclusively precludes any finding of liability against it.

184. Madison responds by arguing that Trussway exaggerates or misstates the content of the testimony it relies on. Further, Madison notes that Trussway's argument fails to mention the conclusions drawn by SGH's experts retained by Crescent. Madison contends that SGH has identified Trussway as the party exclusively or largely responsible for certain instances of truss failure at the Project. Consequently, Madison argues that a genuine issue of material fact remains as to its breach of contract claim and that Trussway's request for summary judgment should be denied.

185. Reviewing the record at summary judgment, the Court concludes that Madison is correct. Viewed in the light most favorable to Madison, the record contains evidence of an agreement between Madison and Trussway and a breach of the terms of that agreement. *See Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 792, 561 S.E.2d 905, 909 (2002) ("The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.")

186. Neither Madison nor Trussway dispute that their signed Purchase Order is a valid contract. Under the terms of the Purchase Order, Trussway warranted that "all Products . . . [would] be manufactured to precise tolerances in accordance with

industry recommendations, [would] be free from defects, and [would] carry such design loads that are specified on the applicable Truss Design Drawing or other drawing provided by Trussway." (Purchase Order ¶ 7.) Evidence that Trussway supplied Madison with defective trusses would thus be evidence tending to show a breach of the Purchase Order.

187. On this point, the SGH experts retained by Crescent, in their final report, identified specific truss defects that they believed were likely caused by manufacturing errors. For example, the SGH experts noted that "the most pronounced and widespread fabrication defect . . . observed . . . [was] . . . insufficiently pressed metal connector plates." (SGH Expert Report 10.) The SGH experts opined that the uniform gaps between MCPs and wood members they observed could not "be attributed to connection behavior driven by in-service truss loads," and that "environmental exposure was not the primary cause of the observed gaps," although it could have been a contributing factor. (SGH Expert Report 10.) The size and uniformity of the gaps, their frequency, and other factors, led the SGH experts to state that the gaps were "all consistent with a manufacturing error that resulted in insufficient plate embedment." (SGH Expert Report 10.) In their report's conclusion, the SGH experts wrote that it was their opinion that the "the 5,322 observed and documented truss deficiencies where excessive gaps were relatively uniform . . . were caused primarily by defective truss manufacturing[.]" (SGH Expert Report 14.) At his deposition, SGH's Milan Vatovec ("Vatovec") summarized these findings by stating that "the primary contributor" to the Project's

truss defects was, in SGH's opinion, "the fabrication process."  (Madison Constr. Grp., Inc.'s Resp. Br. Opp'n Trussway Mfg., Inc.'s Mot. Summ. J. Cross-cls. Ex. J, at 82:24–83:6, ECF No. 407.10.)  Vatovec further testified that faulty fabrication was the only possible cause of certain defects involving missing MCPs.  (Trussway's Reply Br. Further Supp. Mot. Summ. J. Ex. 1, at 95:5–17, ECF No. 431.1.)

188.  In light of this forecast testimony from Crescent's expert witnesses, the Court concludes that a genuine issue of material fact remains as to whether Trussway breached the terms of the Purchase Order with Madison by supplying defective trusses for use in the Project's construction.  The Court will therefore deny Trussway's Motion to the extent it seeks summary judgment on Madison's breach of contract claim.[14]

### 2. Madison's Indemnification Claim

189.  Trussway next moves for summary judgment in its favor on Madison's indemnification claim, arguing that the express terms of the Purchase Order contain only a unilateral promise by Madison to indemnify Trussway in certain circumstances and thus provide no grounds for Madison to seek indemnification from Trussway.

---

[14]  At oral argument, Trussway also argued that Crescent's expert witnesses were not knowledgeable about engineering issues specific to trusses.  Trussway has not, however, filed a motion challenging the admissibility of Crescent's experts' testimony under North Carolina Rule of Evidence 702.  In the absence of such a motion, the Court may not disregard the opinions of Crescent's expert witnesses at summary judgment, and any argument concerning the credibility or reliability of those opinions which falls short of a *Daubert* challenge is for the jury, not the Court.

190. In response, Madison admits that there is no written indemnity provision in its favor in the Purchase Order. Instead, Madison argues it has a right to implied-in-fact indemnity against Trussway "derived from the special relationship between" the parties. (Madison Constr. Grp., Inc.'s Resp. Br. Opp'n Trussway Mfg., Inc.'s Mot. Summ. J. Cross-cls. 18 [hereinafter "Madison Opp'n Trussway Mot."], ECF No. 407.) In support of this argument, Madison notes that North Carolina courts assessing such claims look to the relationship between the parties, the circumstances of the parties' conduct, and whether an indemnity relationship is derivative of the contracting parties' intended agreement, citing *Kaleel Builders*. Madison contends that a right to implied-in-fact indemnity should exist between it and Trussway because the two have a working business relationship, both share "a great interest in determining the cause of the alleged defects" at the Project, and Madison reasonably understood that Trussway would "work to make good on any losses attributable to its fabrication and manufacture of the [t]russes." (Madison Opp'n Trussway Mot. 19.) Madison insists that Trussway is now ignoring substantial evidence that the trusses failed due to manufacturing defects, and that "equitable principles and the body of evidence forecasted in discovery . . . necessitate that Trussway make good on Madison's losses." (Madison Opp'n Trussway Mot. 19.)

191. "A right of indemnity implied-in-fact stems from the existence of a binding contract between two parties that necessarily implies the right." *Kaleel Builders, Inc.*, 161 N.C. App. at 38, 587 S.E.2d at 474. The right "is derived from the relationship between the parties, circumstances of the parties' conduct, and that the

creation of the indemnitor/indemnitee relationship is derivative of the contracting parties' intended agreement." *Id.* In examining this claim by Madison, the Court finds it again helpful to turn to *Kaleel Builders*.

192. In assessing whether a right to indemnity should be implied in fact for the general contractor in *Kaleel Builders*, our Court of Appeals began by citing two decisions it saw as providing helpful guidance: the Eastern District of North Carolina's *Terry's Floor Fashions, Inc. v. Georgia-Pacific Corp.*, No. 5:97-CV-683-BR(2), 1998 U.S. Dist. LEXIS 15392 (E.D.N.C. July 23, 1998), and the Texas Court of Appeals' *American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173 (Tex. App. 1989). *Kaleel Builders, Inc.*, 161 N.C. App. at 40, 587 S.E.2d at 474–75. The Court of Appeals noted that both of these decisions declined to allow a claimant to recover indemnity on an implied-in-fact basis, focusing on the absence of any surety or agency relationship between the claimant and alleged indemnitor. *Kaleel Builders, Inc.*, 161 N.C. App. at 40, 587 S.E.2d at 474–75; *see Terry's Floor Fashions, Inc.*, 1998 U.S. Dist. LEXIS 15392, at * 23–24; *Am. Alloy Steel, Inc.*, 777 S.W.2d at 175–76. Instead, in those cases, the courts held that the claimant had been free to negotiate a provision in its contract to protect itself from foreseeable future liabilities by way of indemnity and had failed to do so. *See Terry's Floor Fashions, Inc.*, 1998 U.S. Dist. LEXIS 15392, at * 23–24; *Am. Alloy Steel, Inc.*, 777 S.W.2d at 175–76.

193. The Court of Appeals then compared the relationship of the parties before it to that between the parties in *McDonald v. Scarboro*, 91 N.C. App. 13, 370 S.E.2d 680 (1988), a case in which the Court of Appeals had concluded implied-in-fact indemnity

was available. *Kaleel Builders, Inc.*, 161 N.C. App. at 40, 587 S.E.2d at 475; *see also McDonald*, 91 N.C. App. at 22, 370 S.E.2d at 686. The court noted that unlike the parties in *McDonald*, the general contractor in *Kaleel Builders* was not in a master-servant or "agency-type relationship" with the subcontractors. *Kaleel Builders, Inc.*, 161 N.C. App. at 40, 587 S.E.2d at 475. The court also stated that there were no circumstances tending to show the existence of an indemnification agreement, written or oral, or any evidence of an intent to create such a relationship. *Id.* The court then announced its holding:

> While we refrain from adopting the limited Texas rule that an implied-in-fact right to indemnity must stem from a surety or an agency relationship, we hold that plaintiff's allegations in this case do not allege a right to indemnification implied-in-fact in North Carolina. Read liberally, plaintiff's complaint alleges breach of contract and breach of warranty by a number of independent subcontractors. For this Court to read a right of indemnity implied-in-fact into such bald allegations would be to do so in every general and subcontractor agreement, thus infringing upon this state's long standing and coveted principle of freedom of contract.

*Id.* at 40–41, 587 S.E.2d at 475. After careful consideration, the Court concludes this holding shuts the door on Madison's argument for implied-in-fact indemnity.

194. Like the general contractor in *Kaleel Builders*, Madison has put forward no evidence of an agency relationship or surety relationship between itself and Trussway. To the contrary, the record here reflects an arm's-length transaction between a construction subcontractor and a manufacturer—an arm's-length transaction in which Madison was free to negotiate a provision for its own indemnification but failed to, like the plaintiffs in *Terry's Floor Fashions* and *American Alloy*. *See Terry's Floor Fashions, Inc.*, 1998 U.S. Dist. LEXIS 15392, at

*23–24; *Am. Alloy Steel, Inc.*, 777 S.W.2d at 175–76.  Indeed, going a step beyond *Kaleel Builders*, the record here reflects that the parties entered into a contract containing a provision that granted Trussway a right to indemnity from Madison. (Purchase Order ¶ 4 ("Contractor shall indemnify and hold harmless Trussway against all claims . . . in any way arising out of or in connection with any of the Contractor responsibilities set forth in these Terms[.]").)  No such indemnity provision was negotiated in Madison's favor.

195.  Based upon *Kaleel Builders*, the Court concludes these facts, even viewed in the light most favorable to Madison, do not give rise to an implied-in-fact right to indemnity under North Carolina law.  Without a doubt, many general contractors, subcontractors, and manufacturers in the construction industry have working business relationships and a shared interest in determining the cause of alleged defects when such allegations arise.  Were the Court to conclude that such relationships or shared interests are sufficient grounds to find an implied-in-fact right to indemnity among parties, that conclusion would suggest an implied right to indemnity exists in countless construction or construction-adjacent agreements throughout North Carolina, infringing upon the freedom of numerous parties to contract as they see fit.  This the Court will not do.  *See Kaleel Builders, Inc.*, 161 N.C. App. at 40–41, 587 S.E.2d at 475.

196.  "In North Carolina, a party's rights to indemnity can rest on three bases: (1) an express contract; (2) a contract implied-in-fact; or (3) equitable concepts arising from the tort theory of indemnity, often referred to as a contract implied-in-law." *Id.*

at 38, 587 S.E.2d at 474. In light of the above discussion, the Court's previous conclusion that Madison may not maintain a negligence-based indemnity claim against Trussway, and Madison's own admission that no express indemnity provision exists in its favor, the Court concludes that no genuine dispute of material fact remains as to Madison's indemnification claim and that Trussway's Motion should be granted to the extent it seeks summary judgment on this claim.

### 3. Madison's Implied Warranty of Workmanlike Construction Claim

197. Finally, Trussway moves for summary judgment in its favor on Madison's claim for breach of the implied warranty of workmanlike construction. Trussway asserts that this cause of action may only be brought by the purchaser of a newly constructed building against the builder-vendor who constructed that building. Because Madison is not an owner and Trussway is not a builder, Trussway argues no warranty of workmanlike construction extends to Madison and no claim may be brought against Trussway on such a basis.

198. Madison disagrees, asserting that Trussway had a legal obligation to provide reliable trusses to Madison that were fabricated in a workmanlike manner and in accordance with industry standards. Madison argues that the disclaimer of warranties included in the Purchase Order was not sufficient to discharge this obligation because it did not disclaim the warranty of workmanlike construction in a clear and unambiguous manner. Madison therefore asserts that its claim should be allowed to proceed to trial. The Court disagrees.

199. The legal principles underlying the implied warranty of workmanlike construction were articulated by the Supreme Court of North Carolina in *Hartley v. Ballou*, 286 N.C. 51, 209 S.E.2d 776 (1974):

> [I]n every contract for the sale of a recently completed dwelling, and in every contract for the sale of a dwelling then under construction, the vendor, if he be in the business of building such dwellings, shall be held to impliedly warrant to the initial vendee that, at the time of the passing of the deed or the taking of possession by the initial vendee (whichever first occurs), the dwelling, together with all its fixtures, is sufficiently free from major structural defects, and is constructed in a workmanlike manner, so as to meet the standard of workmanlike quality then prevailing at the time and place of construction; and that this implied warranty in the contract of sale survives the passing of the deed or the taking of possession by the initial vendee.

*Id.* at 62, 209 S.E.2d at 783. "[T]he purpose of the warranty is to protect homeowners from defects which can only be within the knowledge of vendors." *Gaito v. Auman,* 313 N.C. 243, 251, 327 S.E.2d 870, 876 (1985).

200. In contrast to Madison's argument, our Supreme Court's decisions dealing with the implied warranty of workmanlike construction have applied the warranty only within the context of a builder-vendee relationship. *See Brevorka v. Wolfe Constr., Inc.*, 357 N.C. 566, 597 S.E.2d 671 (2003), *rev'g per curiam*, 155 N.C. App. 353, 573 S.E.2d 656 (2002); *Gaito,* 313 N.C. at 251, 327 S.E.2d at 876; *Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 200, 225 S.E.2d 557, 567 (1976) ("The implied warranty of the *builder-vendor* does not, of course, extend to defects of which the purchaser had actual notice or which are or should be visible to a reasonably prudent man upon an inspection of the dwelling. Where, however, there is a breach of the implied warranty, the *vendee* can maintain an action for damages for such breach[.]" (emphasis added)); *Hartley*, 286 N.C. at 62, 209 S.E.2d at 783; *see also Moss v. Best*

*Knitting Mills*, 190 N.C. 644, 648, 130 S.E.2d 635, 637 (1925) ("It is the duty of the builder to perform his work in a proper and workman-like manner."). These cases make clear that the warranty represents a "relaxing of the rigid rule of *caveat emptor*" on policy grounds, *Gaito*, 313 N.C. at 248, 327 S.E.2d at 875, and is implied only in contracts (i) for the sale of a dwelling recently completed or then under construction (ii) between a builder and an initial vendee.

201. Here, the undisputed facts of record at summary judgment show that the contract between Madison and Trussway was not for the sale or construction of any dwelling, but for the sale and delivery of certain goods, i.e., roof and floor trusses. (Purchase Order 1–2); *see* N.C.G.S. § 25-2-105(1). Madison's appeal to the implied warranty of workmanlike construction is thus misplaced. Accordingly, the Court concludes that no genuine issue of material fact exists as to Madison's claim for breach of the implied warranty of workmanlike construction, and summary judgment is appropriately entered in Trussway's favor dismissing this claim.

G. Sears' Motion

202. The Court has already concluded that the majority of the claims on which Sears has moved for summary judgment—several negligence and contribution third-party claims and crossclaims—should be dismissed for lack of an underlying injury sounding in tort. Sears also argues that A&P's and AP Atlantic's individual breach of contract claims against it should be dismissed at summary judgment. The Court addresses Sears' separate arguments against each claim in turn.

1. A&P's Claim Against Sears for Breach of Sears Subcontract

203. Sears argues that A&P's claim for breach of contract fails because A&P is not a party to the agreement under which Sears agreed to perform work on the Project (the "Sears Subcontract") and thus lacks standing to enforce the contract. Sears further argues that A&P has not pleaded a claim for breach of contract against Sears as a third-party beneficiary of the Sears Subcontract and thus may not now assert that it is a third-party beneficiary to avoid summary judgment on this claim.

204. For reasons identical to those given in connection with the Court's decision to enter summary judgment on A&P's claim for breach of contract against Madison, the Court agrees with Sears. A&P's claim for breach of contract against Sears was not asserted as a third-party beneficiary breach of contract claim, but as an alternative claim alleging the existence of a contract between A&P and Sears. (A&P Third-Party Compl. 38.) The evidence at summary judgment establishes that there is no genuine issue of material fact as to whether A&P was a party to the Sears Subcontract—it was not. (*See, e.g.*, Sears Subcontract 1 (listing AP Atlantic as the Contractor and Sears as the Subcontractor).) The Court therefore concludes that Sears is entitled to summary judgment on A&P's breach of contract claim against it.

2. AP Atlantic's Breach of Contract Claim

205. Sears also requests summary judgment in its favor on AP Atlantic's breach of contract claim, arguing that no party has forecast expert testimony establishing that Sears breached a standard of care in performing its work at the Project. Sears contends that any effort to seek indemnity from it under the Sears Subcontract

requires expert testimony on this point because the common knowledge and experience of a jury is not sufficient to evaluate Sears' compliance with any requisite standard of care.

206. In addition to this argued lack of expert testimony, Sears also asserts that it is entitled to summary judgment because no party in this case has provided evidence linking Sears' conduct to a specific instance of truss defects. Particularly, Sears contends that no expert witness—including those experts from SGH retained by Crescent—has been able to provide any opinion linking Sears to any damage to the Project's trusses at a specific location. Sears further represents that its own expert, George Barbour ("Barbour"), will testify that in the instances in which Sears may have stacked (or allowed its subcontractors to stack) drywall at the Project in excess of the height limitations imposed by AP Atlantic, the trusses should have been able to tolerate that short-term load without sustaining damage. Sears argues that the record thus contains no evidence that Sears' work caused any specific instance of truss failure, and that AP Atlantic's claim for breach of contract should therefore be dismissed.

207. Responding to Sears' standard of care argument, AP Atlantic first notes that it has sued Sears for breach of contract, not negligence. As a result, AP Atlantic contends any standard of care applying to Sears' work on the Project is irrelevant. As to Sears' contention concerning evidence of damages, AP Atlantic argues that the record contains evidence showing Sears breached the Sears Subcontract by overstacking drywall at the Project. AP Atlantic expands upon this point by

explaining that the terms of the Sears Subcontract required Sears to refrain from stacking drywall in excess of certain height requirements and that evidence in the record shows Sears was warned several times not to overstack drywall. AP Atlantic argues that the record also shows that Sears did, in fact, stack drywall in excess of the imposed restrictions on several occasions and that expert testimony supports AP Atlantic's contentions that this overstacking caused damage to the floor trusses.

208. Based upon a review of the record, the Court agrees with AP Atlantic that there is sufficient evidence at summary judgment to conclude that a genuine issue of material fact remains as to whether Sears breached the terms of the Sears Subcontract and that this issue of fact precludes summary judgment on AP Atlantic's claim to the extent it constitutes an ordinary breach of contract claim.

209. Under North Carolina law, proof of damages is not an element of a claim for breach of contract. *See Becker*, 149 N.C. App. at 792, 561 S.E.2d at 909. A claimant who establishes the elements of a breach of contract is entitled "to nominal damages at least." *Bryan Builders Supply v. Midyette*, 274 N.C 264, 271, 162 S.E.2d 507, 511–12 (1968) (quoting *Bowen*, 209 N.C. at 144, 183 S.E. at 268). Consequently, while the claimant must "both allege and offer evidence sufficient to satisfy the jury by the greater weight thereof that he has suffered substantial damage, naturally and proximately caused by the breach" to receive compensatory damages, *Bowen*, 209 N.C. at 144, 183 S.E. at 268, judgment as a matter of law should not be entered against the claimant's entire cause of action on grounds that his or her evidence of damages is wanting, *see Bryan Builders Supply*, 274 N.C. at 271–72, 162 S.E.2d at

511–12 ("Notwithstanding the fact that owners' evidence with reference to their damages, both as to breach of contract and the value of the actual benefit received from Bryan's construction, was minimal, under no theory was Bryan entitled to a judgment of nonsuit. . . . Upon owners showing a breach of contract or a failure of consideration in any amount, they were entitled to recover nominal damages." (citations omitted)); *Hodges v. Young*, No. COA10-975, 2011 N.C. App. LEXIS 370, at *5–6 (N.C. Ct. App. Mar. 1, 2011) (rejecting argument that summary judgment was appropriately granted on a breach of contract claim due to a lack of evidence of damages because "the existence of damages is not an element of a *prima facie* claim for breach of contract").

210. Accordingly, even if AP Atlantic has failed to offer evidence of damages at summary judgment, as Sears contends, Sears is not *ipso facto* entitled to summary judgment in its favor on AP Atlantic's breach of contract claim if evidence in the record tends to support the elements of that claim. Reviewing the record here in the light most favorable to AP Atlantic, the Court concludes such evidence is present.

211. AP Atlantic and Sears do not dispute the validity of the Sears Subcontract, under which Sears promised that its work would be completed in conformity with the Subcontract and Prime Contract Documents and "in a skillful and workmanlike manner[.]" (Sears Subcontract § 1.2.) The Scope of Work Matrix attached to the Sears Subcontract outlined Sears' responsibilities for delivery and stacking of drywall and indicated that "[n]o single stack" was to exceed "18 [inches] in height." (Sears Subcontract Ex. D, at 1.) The contract also stated that Sears would "follow [AP

Atlantic's] clean-up and safety directions" and would "complete the work in strict compliance with all safety measures required by [the Sears Subcontract]." (Sears Subcontract § 9.1.)

212. The record also contains numerous instances of AP Atlantic personnel providing Sears with instructions which could reasonably be characterized as "safety" or "clean-up" instructions relating to drywall stacking. For example, on December 27, 2013, AP Atlantic's Louis Hall ("Hall") sent an e-mail to Sears' project manager stating, "Sheetsare [sic] to be layed [sic] down and stacked no more than 20 sheets (12") high" and attaching a document provided by the Project's engineer explaining that placing excessive construction loads on floor trusses was an unsafe act which could result in property damage. (AP Atl. and Adolfson & Peterson Constr., Inc.'s Resp. Sears Contract, Inc.'s Mot. Summ. J. Ex. B, at Dep. Ex. 37, ECF No. 389.) Hall's e-mail asked Sears' project manager to "[m]ake sure the crews stockingstay [sic] within these perimeters so they don't overload the trusses." (AP Atl. and Adolfson & Peterson Constr., Inc.'s Resp. Sears Contract, Inc.'s Mot. Summ. J. Ex. B, at Dep. Ex. 37.) On January 10, 2014, Sears received another e-mail instructing it to "restack the drywall on third floor so the piles do not go over ten high." (AP Atl. and Adolfson & Peterson Constr., Inc.'s Resp. Sears Contract, Inc.'s Mot. Summ. J. Ex. C, at 129:5– 6, ECF No. 390.) Finally, on March 31, 2014, Hall sent an e-mail to Sears' project manager reading, "Tia your crews have stacked over 44 sheets in unit 301. These trusses may be damaged and may now require inspection by the structural engineer. You have to get your subs under control on this before someone gets killed." (AP Atl.

and Adolfson & Peterson Constr., Inc.'s Resp. Sears Contract, Inc.'s Mot. Summ. J. Ex. B, at Dep. Ex. 38.)

213. Further evidence in the record tends to show that Sears did, in fact, overstack drywall at the Project site, violating the terms in the Sears Subcontract and AP Atlantic's instructions. For example, one fact witness deposed by the parties indicated that, on one occasion, he "walked the third floor [of] Building E" and "could not enter a unit without climbing over approximately two feet tall drywall stacked in the entrance portion of the unit." (Madison Constr. Grp., Inc.'s Resp. Br. Opp'n Sears Contracting Co.'s Mot. Summ. J. Cross-cls. Ex. J, at 130:3–6 [hereinafter "Overstacking Testimony"], ECF No. 397.10.) That same witness stated he also observed drywall stacked "at eye level" in Building E. (Overstacking Testimony 130:6–7, 158:1 – 3.) Another fact witness testified that he recalled seeing drywall stacked at a height slightly above his knees, estimating it to be about thirty inches. (Overstacking Testimony 87:4–12.) Photographs attached to SGH's expert report also purport to show drywall stacked in excess of AP Atlantic's instructions or the Sears Subcontract's requirements in at least two locations in Buildings A and C. (Madison Constr. Grp., Inc.'s Resp. Br. Opp'n Sears Contracting Co.'s Mot. Summ. J. Cross-cls. Ex. L, ECF No. 397.12.)

214. Examining the totality of this evidence, the Court concludes that a genuine issue of material fact exists as to whether Sears breached the terms of the Sears Subcontract by stacking drywall, or allowing drywall to be stacked, contrary to the terms of that agreement and AP Atlantic's orders. This issue of fact precludes the

Court from entering summary judgment in Sears' favor on AP Atlantic's breach of contract claim as requested. *See Bryan Builders Supply*, 274 N.C. at 271–72, 162 S.E.2d at 511–12; *Hodges*, 2011 N.C. App. LEXIS 370, at *5–6. This conclusion does not, however, end the Court's analysis.

215. To the extent that AP Atlantic's breach of contract claim contains a demand for contractual indemnity based upon Sears' obligation to indemnify AP Atlantic for "injury to or destruction of tangible property . . . to the extent caused in whole or in any part by any negligent act or omission of" Sears, (Sears Subcontract § 15.1), Sears' arguments at summary judgment have merit. Particularly, while it is ordinarily not necessary to establish a standard of care to prove a breach of contract, *see Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 264 n.3, 636 S.E.2d 835, 840 n.3 (2006) ("[E]xpert witness testimony concerning the professional standard of care would not be necessary to establish a breach of contract[.]"), to the extent the Sears Subcontract specifically creates an obligation triggered by Sears' negligence, the Court concludes AP Atlantic must be able to forecast evidence at summary judgment establishing Sears' negligence to show Sears' breach of that obligation, *see id.* at 264 n.3, 266, 636 S.E.2d at 840 n.3, 841 (recognizing that either negligence or a breach of contract "could be the basis for indemnity according to [a] contract" that provided for indemnity for damage resulting from "any negligent act" or from the "breach of [the] Agreement"). AP Atlantic has failed in this regard because it is unable to forecast expert testimony establishing Sears' standard of care.

216. Expert testimony is generally required to establish a standard of care in "professional negligence action[s]" where the "common knowledge and experience of the jury" would not be sufficient to evaluate a professional's compliance with the relevant standard of care. *See Frankenmuth Ins. v. City of Hickory*, 235 N.C. App. 31, 35, 760 S.E.2d 98, 101 (2014). This requirement is not limited to negligence claims brought against the classic learned professions, however, but applies in all cases where some degree of professional judgment or esoteric knowledge is required to evaluate the defendant's standard of care. *See id.* at 34–36, 760 S.E.2d at 101–02 (requiring expert testimony for standard of care applicable to municipal water system operator). Only where the facts are "of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, [and] a departure therefrom," or where the conduct is grossly negligent, will a party be able to proceed on such a claim without expert testimony. *Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 411, 590 S.E.2d 866, 871 (2004).

217. North Carolina courts have not determined whether expert testimony is necessary to establish the standard of care applicable to drywall subcontractors in the circumstances presented here. Courts in other jurisdictions, however, appear to be in agreement that expert testimony is generally required to establish the standard of care applicable to those engaged in construction-related work absent egregious or obvious mistakes. *See 34 Degrees N., LLC v. Mountain View Constr., LLC*, No. 1 CA-CV 15-0646, 2016 Ariz. App. Unpub. LEXIS 1552, at *14 (Ariz. Ct. App. Dec. 13, 2016) ("[T]he standard of care involved in construction is not an area that comes within the

realm of common knowledge." (citing *Woodward v. Chirco Constr. Co.*, 687 P.2d 1275, 1276–77 (Ariz. Ct. App. 1984))); *Miller v. L.A. Cty. Flood Control Dist.*, 505 P.2d 193, 202 (Cal. 1973) ("The average layman has neither training nor experience in the construction industry and ordinarily cannot determine whether a particular building has been built with the requisite skill and in accordance with the standards prescribed by law or prevailing in the industry."); *Sandstrom v. Austin & Bednash Constr., Inc.*, No. 09C-07-027 MJB, 2011 Del. Super. LEXIS 126, at *10 (Del. Super. Ct. Mar. 29, 2011) (holding that how a reasonably prudent construction company would have filled trenches was "not within the common knowledge of a layperson"); *Roberts v. Daystar Sills, Inc.*, No. 05C-04-189 CLS, 2008 Del. Super. LEXIS 470, at *8 (Del. Super. Ct. Dec. 8, 2008) ("[T]he determination of what conditions are expected and reasonable at a closed construction site requires specialized knowledge."); *see also Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc.*, 392 F.2d 472, 478 (8th Cir. 1968) ("Questions relating to stress and strain and weight-bearing capacities of structural elements are beyond the ordinary comprehension of most laymen and the court and jury require expert enlightenment on issues of this type.").

218.  The reasoning behind these decisions is sound.  Absent expert testimony explaining "the routine practices and acceptable conditions at a closed construction site, where trade persons are trained to work in and around precarious conditions, [a] jury would be left to speculate as to the standard of care" required of those working at the site.  *Roberts*, 2008 Del. Super. LEXIS 470, at *8.  In the instant case, a jury attempting to evaluate the standard of care applicable to Sears will face the same

difficulties. The Court therefore concludes that expert testimony is required to establish Sears' standard of care.

219. AP Atlantic argues against this conclusion and contends that any relevant standard of care here was set was set by the instructions provided to Sears and the terms of the Sears Subcontract and that "a jury would not require expert testimony to assess whether it was reasonable to breach the contract's terms by overloading the trusses." (AP Atl. and Adolfson & Peterson Constr., Inc.'s Resp. Sears Contract, Inc.'s Mot. Summ. J. 10 n.5 [hereinafter "AP Atl. Br. Opp'n Sears' Mot."], ECF No. 387.) AP Atlantic does not cite any law to support this argument, and the Court disagrees with its premise.

220. A professional's negligence is determined by reference to the applicable standard of care in that professional's community, *see Little v. Matthewson*, 114 N.C. App. 562, 566, 422 S.E.2d 567, 570 (1994) (noting the need to establish the standard of care in the same community to assess professional negligence); *Heath v. Swift Wings, Inc.*, 40 N.C. App. 158, 163, 252 S.E.2d 526, 529 (1979) ("[O]ne who engages in a business, occupation, or profession must exercise the requisite degree of learning, skill, and ability of that calling with reasonable and ordinary care."), and how a reasonable professional in the same circumstances would have acted, *see Frankenmuth Ins.*, 235 N.C. App. at 36, 760 S.E.2d at 102 (summary judgment appropriate where no expert could testify what a reasonable municipal water operator would do under the facts of the case), not by reference to contractual terms. The Court is not aware of any North Carolina case holding that expert testimony

concerning a profession's standard of care is unnecessary in the presence of a contract, and AP Atlantic has not cited any case supporting this assertion. The Court declines to adopt such a rule here. Neither the Court nor the jury are positioned to know the importance of strict adherence to stacking limits in the drywall industry, whether any leeway is tolerable, or the factors a reasonable drywall subcontractor takes into account when determining how to stack drywall at any given location.

221. Perhaps anticipating this conclusion, AP Atlantic also points to testimony from SGH's Daniel Valentine ("Valentine"), who "testified that Sears 'should [have] follow[ed] the standards that are part of the project documents.'" (AP Atl. Br. Opp'n Sears' Mot. 9.) A review of Valentine's deposition testimony, however, reveals that this statement is not sufficient to serve as an expert opinion concerning Sears' standard of care. At his deposition, Valentine was clear that he was not prepared to speak to the standard of care applicable to drywall contractors, and the statement AP Atlantic quotes was at most a conjectural opinion that was not informed by knowledge of the drywall industry:

> Q: What is the actual practice in the industry among drywall subcontractors in terms of the manner in which drywall is stored or stacked on a multifamily wood-framed residential project like [the Project]?
>
> A: I can't speak to that.
>
> Q: So you wouldn't be able to express any opinion in that regard, would you?
>
> A: With regard to industry standard, no, but I can go by the project documents here.
>
> Q: I guess to ask the question differently, sir, in a more plain English way, are you able to provide any testimony or opinions as to whether drywall

subcontractors in the field in practice are actually following a particular standard that you located in a book?

A: I don't know what they generally follow in the industry. I think they should follow the standards that are part of the project documents.

(AP Atl. Br. Opp'n Sears' Mot. Ex. G, at 339:23–340:17, ECF No. 394.) This testimony does not provide AP Atlantic with an expert opinion tying Sears' standard of care to the terms of the Sears Subcontract and thus does not support AP Atlantic's attempt to rely on that document or the other provided instructions in the absence of further expert testimony.

222. The Court thus concludes that AP Atlantic has failed to come forward with evidence sufficient to show the standard of care applicable to Sears. Without such evidence, AP Atlantic cannot establish Sears' negligence for purposes of the indemnity provision in the Sears Subcontract. *See Frankenmuth Ins.*, 235 N.C. App. at 37, 760 S.E.2d at 102 ("[W]ithout evidence of the applicable standard of care, [plaintiff] [has] failed to establish a *prima facie* claim for professional negligence." (quoting *Michael v. Huffman Oil Co.*, 190 N.C. App. 256, 272, 661 S.E.2d 1, 11–12 (2008))).[15] The Court will therefore grant Sears' Motion and enter summary

[15] AP Atlantic also argues that Sears' 30(b)(6) representative acknowledged (i) that the Sears Subcontract specifications set the standard of care, (ii) that he was "not sure" if there was an industry standard and that guidelines varied by project, (iii) that Sears did not set stacking guidelines itself, and (iv) that Sears had to follow stacking protocols "to avoid damaging the trusses." (AP Atl. Br. Opp'n Sears' Mot. 9.) For support for points (ii) and (iv), AP Atlantic cites pages 218–19 of the Exhibit C to its opposition brief, which is the transcript to Sears' 30(b)(6) deposition. Exhibit C does not, however, include any pages past page 175, and those pages that have been submitted to the Court do not contain testimony acknowledging that Sears had to follow stacking protocols "to avoid damaging the trusses" or that any representative was "not sure" if there was an industry standard for drywall stacking. The deposition excerpt also lacks any acknowledgment from Sears that the Sears Subcontract or any other document set Sears' standard of care. The only testimony contained in Exhibit C supporting AP Atlantic's arguments are statements by Sears' representatives that they did

judgment on AP Atlantic's breach of contract claim in Sears' favor to the extent that claim seeks contractual indemnity from Sears based upon Sears' negligence.[16]

H.    Interior Distributors' Motion

223.   Interior Distributors requests the Court to enter summary judgment in its favor on AP Atlantic's claim for breach of express and implied warranties.  In support of this request, Interior Distributors asserts that AP Atlantic has produced no evidence of any contract, or other representation, giving rise to an express warranty made by Interior Distributors.  Accordingly, Interior Distributors contends AP Atlantic's breach of warranty claim should be dismissed to the extent it is based on an alleged express warranty.

224.   To the extent AP Atlantic's breach of warranty claim alleges the existence of implied warranties, Interior Distributors asserts two arguments for dismissal. First, Interior Distributors argues that AP Atlantic is not in contractual privity with Interior Distributors and thus may not assert a claim for breach of an implied warranty for purely economic loss.  Second, Interior Distributors contends that the only warranties the law would possibly imply in this situation would be linked to the product Interior Distributors is alleged to have supplied—the Project's drywall—not

---

not create their own protocols for stacking drywall, that protocols were normally furnished by the general contractor on a project, and that protocols and guidelines varied project to project. (AP Atl. Br. Opp'n Sears' Mot. Ex. C, at 39:3–44:19, ECF No. 390.)  This testimony does not amount to an expert opinion concerning an applicable standard of care or an admission as to what Sears' standard of care would have been.

[16]  In light of the Court's ruling, the Court declines to address Sears' separate argument for dismissal of AP Atlantic's breach of contract claim, i.e., that AP Atlantic has failed to offer substantial evidence that Sears proximately caused the loss for which AP Atlantic has sought contractual indemnity from Sears based upon Sears' negligence.

the manner in which Interior Distributors delivered or arranged the product at the Project site.

225. AP Atlantic did not defend its breach of warranty claim in its briefing and at oral argument indicated that it did not oppose Interior Distributors' Motion as to this claim.

226. Based upon its review of the record, the Court agrees with Interior Distributors arguments. The record at summary judgment contains no evidence of an express warranty from Interior Distributors extending to AP Atlantic. Furthermore, AP Atlantic has not identified a specific implied warranty that it believes Interior Distributors breached, and there is no evidence that those mentioned in AP Atlantic's Amended Third-Party Complaint—the implied warranties of merchantability or fitness for a particular purpose, (Am. Third-Party Compl. 17)—were breached by unfit or unsuitable drywall. Accordingly, the Court concludes that no genuine issue of material fact remains as to AP Atlantic's breach of express or implied warranties claim and grants summary judgment on that claim in Interior Distributors favor.[17]

V.

CONCLUSION

227. **WHEREFORE**, the Court hereby **ORDERS** as follows:

---

[17] Interior Distributors' Motion also seeks summary judgment on a request by AP Atlantic for attorneys' fees. Although AP Atlantic indicated at oral argument that it did not oppose this portion of Interior Distributors' Motion, the Court's dismissal of AP Atlantic's claims against Interior Distributors renders AP Atlantic's request for attorneys' fees moot.

a. The AP Parties' Motion is **GRANTED in part** and **DENIED in part** as follows:

   i. The AP Parties' Motion is **GRANTED** as to Crescent's claimed expenses categorized as relating to hotels ($906,847.74), shuttles and storage ($253,319.18), relocation stipends ($500,446.46), and attorneys' fees incurred in dealing with residents ($10,604.75). Crescent shall not be permitted to recover these claimed expenses from the AP Parties.

   ii. The remainder of the AP Parties' Motion is **DENIED**.

b. Madison's Motion, Trussway's Motion, Sears' Motion, and Interior Distributors' Motion are all **GRANTED in part**, and T.A. Kaiser's oral motion made at the May 30, 2018 hearing is **GRANTED**, as to the negligence-captioned implied-in-law indemnity claims or contribution claims asserted against Madison, Trussway, Sears, Interior Distributors, and T.A. Kaiser. Further, the Court *sua sponte* enters summary judgment and dismisses the remaining implied-in-law indemnity claims and contribution claims asserted against these parties. The Court therefore dismisses the following claims in the Lead and Crescent Actions:

   i. AP Atlantic's claim for implied-in-law indemnity against Trussway is dismissed with prejudice.

ii. AP Atlantic's claim for implied-in-law indemnity against Interior Distributors is dismissed with prejudice.

iii. A&P's claim for implied-in-law indemnity against Madison is dismissed with prejudice.

iv. A&P's claim for implied-in-law indemnity against T.A. Kaiser is dismissed with prejudice.

v. A&P's claim for implied-in-law indemnity against Sears is dismissed with prejudice.

vi. A&P's claim for implied-in-law indemnity against Trussway is dismissed with prejudice.

vii. Madison's claim for implied-in-law indemnity against Trussway is dismissed with prejudice.

viii. Madison's claim for contribution against Trussway is dismissed with prejudice.

ix. Madison's claim for implied-in-law indemnity against Sears is dismissed with prejudice.

x. Madison's claim for contribution against Sears is dismissed with prejudice.

xi. Madison's claim for implied-in-law indemnity against T.A. Kaiser is dismissed with prejudice.

xii. Madison's claim for contribution against T.A. Kaiser is dismissed with prejudice.

xiii. T.A. Kaiser's claim for implied-in-law indemnity against Madison is dismissed with prejudice.

xiv. T.A. Kaiser's claim for contribution against Madison is dismissed with prejudice.

xv. T.A. Kaiser's claim for implied-in-law indemnity against Trussway is dismissed with prejudice.

xvi. T.A. Kaiser's claim for contribution against Trussway is dismissed with prejudice.

xvii. Trussway's claim for contribution against Madison is dismissed with prejudice.

xviii. Trussway's claim for implied-in-law indemnity against Sears is dismissed with prejudice.

xix. Trussway's claim for contribution against Sears is dismissed with prejudice.

xx. Trussway's claim for implied-in-law indemnity against T.A. Kaiser is dismissed with prejudice.

xxi. Trussway's claim for contribution against T.A. Kaiser is dismissed with prejudice.

c. Any implied-in-law indemnity or contribution claims remaining in the Lead or Crescent Actions are subject to dismissal upon proper motion to the Court.

d. Madison's Motion and T.A. Kaiser's Motions are **GRANTED in part** as to AP Atlantic's request to hold Madison, T.A. Kaiser, and other parties jointly and severally liable for breach of contract. Any liability found on AP Atlantic's separate breach of contract claims shall not be joint and several.

e. Madison's Motion is further **GRANTED in part** and **DENIED in part** as follows:

   i. To the extent Madison's Motion requests summary judgment on A&P's breach of contract claim, the motion is **GRANTED**. A&P's breach of contract claim against Madison is dismissed with prejudice.

   ii. To the extent Madison's Motion requests summary judgment on the issue of consequential damages, the motion is **DENIED** as moot to the extent it concerns liability related to Crescent's claimed expenses categorized as relating to hotels ($906,847.74), shuttles and storage ($253,319.18), relocation stipends ($500,446.46), and attorneys' fees incurred in dealing with residents ($10,604.75). To the extent Madison's Motion requests summary judgment on any other issue of damages, the motion is **DENIED**.

   iii. To the extent Madison's Motion requests summary judgment on AP Atlantic's delay-based breach of contract claim, the motion is

**GRANTED**. AP Atlantic's delay-based breach of contract claim against Madison is dismissed with prejudice.

f. Except as noted otherwise, T.A. Kaiser's motion is **DENIED**.

g. Trussway's Motion is further **GRANTED in part** and **DENIED in part** as follows:

    i. To the extent Trussway's Motion requests summary judgment on Madison's breach of contract claim, Trussway's Motion is **DENIED**.

    ii. To the extent Trussway's Motion requests summary judgment on Madison's indemnification claim, Trussway's Motion is **GRANTED**. Madison's indemnification claim against Trussway is dismissed with prejudice.

    iii. To the extent Trussway's Motion requests summary judgment on Madison's claim for breach of the implied warranty of workmanlike construction, Trussway's Motion is **GRANTED**. Madison's claim against Trussway for breach of the implied warranty of workmanlike construction is dismissed with prejudice.

h. Sears' Motion is further **GRANTED in part** and **DENIED in part** as follows:

    i. To the extent Sears' Motion requests summary judgment on A&P's claim for breach of contract against Sears, Sears' Motion is

**GRANTED**.  A&P's claim for breach of contract against Sears is dismissed with prejudice.

ii.  To the extent AP Atlantic seeks contractual indemnity from Sears based upon Sears' negligence, Sears' Motion is **GRANTED**.  AP Atlantic shall not recovery contractual indemnity from Sears based upon Sears' alleged negligence.

iii.  To the extent Sears' Motion requests summary judgment on the remainder of AP Atlantic's breach of contract claim, Sears' Motion is **DENIED**.

i.  Interior Distributors' Motion is **GRANTED**.  AP Atlantic's claim against Interior Distributors for breach of express and implied warranties is dismissed with prejudice, and AP Atlantic's request for attorneys' fees is dismissed as moot.

**SO ORDERED**, this the 8th day of August, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge